IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

RUSSELL E. STEEDLEY,                    )
    Plaintiff,                           )
    v.                                   )   C.A._____  0 7 - 4 4 8
CORRECTIONIONAL MEDICAL SERVICES, Inc, et al,  )
    Defendants.                          )

## MOTION FOR TEMPORARY RESTRAINING ORDER/ PRELIMINARY INJUCTION

Comes now, pro se, plaintiff pursuant to Fed. R. Civ. Proc., Rule 65 and all other appropriate Federal

Court Rules, Local Rules, and or case authority and requests that the Court issued a temporary restraining

order/preliminary injunction directing defendant Correctional Medical Service, Inc. (CMS), to

immediately provide plaintiff with the below listed medical care.

First, however, plaintiff seeks pleading leniency as a pro se plaintiff under <u>Haines v. Kerner</u>, 404 U.S. 519

(1972).

## DECLARATION IN SUPPORT OF PLAINTIFF'S MOTION FOR A TRO/PI

1.    I, Russell Steedley, am the plaintiff in the instant action, and Steedley declares under penalty

of perjury the following in support of his motion for temporary restraining order/preliminary

injunction (TRO/PI) requesting needed medical care.

2.    Plaintiff requires medical care – below – for the following:

    a) To avoid the continued and needless pain and suffering;
    b) To avoid the unnecessary impairment of plaintiff's normal daily functions;
    c) To avoid the substantial likelihood of future serious/permanent injuries; and
    d) To avoid CMS gaining a windfall through its refusal to provide needed medical care.

### Refusal to Provide Total Joint Replacement Surgery

3.    Steedley suffers from severe Osteoarthritis, otherwise known as Degenerative Joint Disease

(DJD) in his right knee and hip. (See Exhibit 1).

4.	Steedley has been treated with various forms of nonsteroidal anti-inflammatory drugs (NSAID) for over ten years, as prescribed by all of the contracted health care providers for this prison.

5.	The NSAID drugs ordinarily the first step in treatment of DJD conditions. However, all NSAID drugs carry a substantial risk to users when taken over a long periods of time, as found in all precautious/warning regarding these drugs.

6.	From 2001 to 2003, Steedley along with Lt. Governor's office, get into a lengthy confrontation with this institution, the commissioners office, and all of the health care providers contracted by this prison on the issue concerning "Co-pay issue: charging chronic care patients for appointments and treatment" and "discontinuation of meds." In conclusion: the Lt. Governors office sided with Steedley's position that, "any and all chronic care patients should not be charged for medication renewal appointments." (Exhibits 2 to 4)

7.	However, each subsequent health care provider that was contracted by Delaware's DOC would continue to attempt to charge indigent inmates that were previously diagnosed as having a chronic condition. Therefore, Steedley would continually experience problems with every contracted health care provider regarding the abrupt discontinuation of receiving chronic care medication. (Exhibits 5, 6)

8.	In November 23, 2003, Steedley first officially raises the issue and need for an operation as oppose to the constant – yet inconsistent treatment of (NSAID) drugs. Steedley writes to FCM, (the acting health care provider at that time), expressing concerns of medical toxicity and need for alternative treatment three years after Dr. Cancino expressed the same concerns. (Exhibit 7)

9.	Between the years 2003 to 2006, Steedley DJD condition was constantly minimized by all HCP's physicians, who would constantly respond to Steedley's complains regarding the pain he is enduring and the possible toxicity produced by the prescription drugs that they are

2

treating him for the DJD, with the constant reframe that the HCP would never allow him to receive a operation because it is too costly.

10.    In September of 2006, Steedley was examined by Dr. DuShuttle, an orthopedic specialist, who concluded that despite the Steedley's relative age (then 47 years old) that his only option is to get a total hip replacement. (Exhibit 8).

11.    In October 2006, Dr. Durst reviewed plaintiff's records and X-Rays and concurred with Dr.DuShuttle's decision. Durst expressed serious concerns that Steedley's DJD condition may develop into necrosis since the origin of the injury originated from a blunt force trauma incident following an accident that occurred over seventeen years ago, as opposed to the normal aging process. Durst placed Steedley on stronger pain-reliever (name unknown). Steedley has been pushing for an operation for over three years, when the pain started to rob him of his normal mobility and became unbearable despite the constant use of the prescribed pain-relievers given by the health care providers. Durst agreed that Steedley should have received an operation years ago after examining his X-rays and he also felt that age wasn't a determining factor.

12.    In November of 2006, Steedley was seen by another CMS physician, Dr. Van Dusin, who placed him on Vicodine (a narcotic) treatment to counter some of the intense pain that he was experiencing. Van Dusin also placed a medical referral for the Steedley to be seen by a Physical Therapist. Van Dusin stated that, "this is often a necessary step in order to get the CMS administrators to move for an operation, because plaintiff hip is in really bad shape." Both Van Dusin and Durst, after reviewing Steeedley's X-rays of his hip, expressed bewilderment as to why it had taken this long for Steedley to be taken out to be seen by a orthopedic specialist.

13.    In mid January, Steedley filed a Medical Grievance against CMS for failing to abide by Van Dusin's November 2006 referral. At the MG hearing, Nurse Debbie Rodweller and Steedley agree to drop the issue providing that he was taken to the Physical Therapist referral

appointment within a couple of weeks. In addition, RN Rodweller and Steedley agree to settle future medical issues by formal correspondence as oppose to filing a grievance, providing that they can be address in a timely matter. (Exhibit 9)

14.  In early February 2007, Steedley was sent to a Physical Therapist appointment at a Kent General Hospital (KGH) outpatient clinic, where PT Jonnice Steward put him through a series of mobility tests. These test revealed just how limited Steedley's mobility had degraded: prompting Stewart to say, "there's nothing we can do for you here..." PT Stewart agrees that Steedley needs an operation before full physical therapy can be implemented and gave Steedley an exercise pamphlet that outlined some very mild and basic exercises in order to help retain some muscle definition in his leg. (Exhibit 10, 11)

15.  At the end of February 2007, Steedley's pain-relief medication Vicodine runs out again. CMS nurse tells Steedley he must make a medical appointment to get a reorder. (Exhibit 12) Steedley would be forced to go without their pain-relief medication for several days.

16.  In March 2007, at a medical appointment, Steedley is told by Nurse Practitioner Ihuma, that according to his latest blood test, that his internal organs are no longer functioning at 100%, in particularly his kidneys. Ihmua voices serious concerns and then orders another series of blood tests and renews medication.

17.  On March 19, 2007, Steedley sends Nurse Rodweller a second formal letter concerning his hip replacement surgery since a favorable second opinion for it was provided by the PT.

18.  On April 10, 2007, Steedley files a MG for hip replacement surgery, since RN fails to respond to two formal letters for same request. In addition, Nurse Practitioner Ihuma discontinues Vicodine treatment for DJD condition, while renewing Indocin drug.

19.  A MG hearing (#106905) is convened on April 19th, 2007 with unknown nurse. Despite recognizing Steedley's severe condition, nurse argues that, "you are too young for an hip replacement operation." Grievance is denied and appealed.

4

20.    Some time in April 2007, Steedley runs into Inmate David Williamson, who recently received
       an ACL knee operation. Williamson informs Steedley that he was only able to receive the
       proper treatment (surgery) from CMS after filing a 1983 Civil Complaint form and TRO/PI,
       because prior to the operation, CMS use every form of delaying tactic to prevent them from
       having to spend the funds necessary for such the surgical procedure. (Exhibit 13)

21.    Another inmate named William Newsome, would experience the same type of tactic by CMS
       and its predecessors when he started experiencing lower back pains in early 2003.

22.    Both Williamson and Newsome informed Steedley that they would only achieve the
       necessary surgery that their doctors recommended and was required only after taking legal
       recourse. Both inmates stated that their situation and problems with CMS and other
       contracted health care providers were not isolated incidents and that many other inmates were
       in the same predicament, naming specifically: Roger Re, Efram Cobb, and Michael
       McCloskey as just a few of those they knew to have undergone the same tactics by CMS and
       who had received some form of operation, despite their age. Both agreed that every health
       care provider for this prison, especially CMS used the same tactic and followed the same
       pattern of denials that denied inmate patients adequate treatment. And both encouraged
       Steedley to follow their example, if he desired a positive resolution to his suffering.

23.    On May 7, 2007, Steedley was seen by Dr. Van Dusin as a chronic care appointment.
       Steedley's returned blood test results were normal, except for kidneys. At Steedley's behest,
       Van Dusin places another formal notice recommending the hip replacement surgery. He tells
       Steedley that, "CMS has to approve of this operation first, and that has always been a
       problem, even when a patient really needs it. However, if they approve of the surgery, you
       will be taken first to see another specialist for prepping and then the operation should follow
       within 60 days." Steedley is placed on Vicodine treatment again by Van Dusin, since his
       Vicodine treatment had been discontinued again and required reordering. Until that

5

appointment, Steedley went a few weeks without that pain-reliever to help stemmed the pain - despite filing a timely medical appointment request for renewal of meds.

24.    During the entire Memorial Day weekend, Vicodine drug was not available to any patient with a prescription. Nurses at med window stated that they had run out and won't be getting re-supplied until the holiday weekend ends. (Exhibit 14)

25.    At a June 18, 2007 medical appointment, Nurse Practitioner Ihuma reviews Steedley's medical record and again expresses her concerns regarding his kidneys, while acknowledging that the current treatment for Steedley's DJD condition is the primary reason for his internal problems. Ihuma, changes Steedley's blood pressure medication and states that they will have to keep a close eye on his kidneys. Steedley asks about the status of his hip replacement. To which, Ihuma checked Steedley's record and finds Dr. Van Dusin's recommendation which strongly urges CMS to approve of hip surgery for him. However, Ihuma adds that they (CMS) haven't decided yet, despite knowing the status of Steedley's deteriorating kidney and how the treating drugs are damaging them.

26.    Given the seriousness of Steedley's condition, as voiced by Ihuma and Van Dusin, combined with the delays in the Grievance process, he felt compelled to write to the Warden of D.C.C and the Commissioner of Department of Corrections (DOC), who he had met a month earlier and spoke to Steedley about his DJD and the lack of treatment by CMS. (Exhibit 15 to 18)

27.    On June 26, 2007, Steedley's Medical Grievance Hearing at Level II, is heard by Director of Nurses for CMS Gail Eller; Captain McCreanor; Corporal Dutton; and two other CMS nurses. After cursive review of Steedley's medical file, Nurse Eller stated that: "CMS administrators are currently postponing any decision regarding your operation while awaiting further information from Dr. Van Dusin." Ergo, effectively denying Steedley's claim. Grievance is denied. Appealed is filed and submitted to next and last level of the Grievance Process of the same day. (Exhibit 19, 20)

6



28. CMS's claim that Dr.DuShuttle wrote in his recommendation "that Steedley is too young for an operation," is a red herring and purposely obfuscates this issue because that is not what he actually said, nor meant, as witnessed by inmate Michael Moore, who was present when DuShuttle made the recommendation. (Exhibit 8) Moore paid close attention to what was said at that orthopedic appointment because he had experienced the same type of erroneous reporting in his case. In addition, Van Dusin read the recommendation that DuShuttle made - a copy of which was in Steedley's medical record - and he too agreed that CMS was skewing DuShuttle's statement and recommendation, to support their own cost saving policies that deprive inmate/patients of proper medical care.

29. CMS is consistent with its pattern of denials and delays combined with its substandard care, their actions must be construed as deliberate indifference act and/or reckless disregard to their patient's medical needs and health.

30. For these and the point set forth in the supporting memorandum, Steedley believes that he is entitled to a TRO/PI order directing defendant CMS and or its successor to provide the medical care recommended by Dr. DuShuttle, and supported by Dr. Durst and Dr. Van Dusin without further delay.

31. The above is true and correct according to Steedley's personal experience, observations, and to the best of his knowledge and well-reasoned beliefs. Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the above is true and correct.

Russell Steedley
SBI#249572, W-1, H-13
Delaware Correctional Center
1181 Paddock Rd
Smyrna, DE 19977

July 16, 2007
Date

Date:        12/6/01

To:          I/M Russell Steedley SBI# 249572 SI    $\bar{F}$-$\%$

From:        Robert Hampton, RN DON

Re:          Request for medical services

Above named inmate is currently being treated for his chief complaint of degenerative Joint Disease (DJD). The current plan prescribed is exercise as tolerated and Tylenol 650mg every 8 hours as needed. It has been explained to this inmate that his disease will progress and the medical department will address it accordingly. The physician's impression of this inmate's condition as of 11/21/01 was that he can ambulate without difficulty, is capable of working and can workout. At this point surgery is not warranted and not recommended.

Robert Hampton, RN DON

Cc: Warden, Thomas L. Carroll

**Exhibit 1**



STATE OF DELAWARE
OFFICE OF THE LIEUTENANT GOVERNOR

RUTH ANN MINNER
LIEUTENANT GOVERNOR

March 22, 1999


Russell Steedley
00249572
S-1 Unit
Delaware Correctional Center
Smyrna, DE 19977

Mr. Steedley:

Our office received your letter and we have contacted Mr. Paul Howard, Bureau Prison Chief. I have asked Mr. Howard to address your concerns and get a reply back to me.

First things first, though. If you have not filed a grievance, you must do so. I will respond as soon as I hear from Mr. Howard.

Thank you for your patience.

Sincerely,

Debra S. Allen
Office of the Lieutenant Governor

**Exhibit 2**

TATNALL BUILDING
DOVER, DELAWARE 19901
(302) 739 - 4151

CARVEL STATE OFFICE BUILDING
WILMINGTON, DELAWARE 19801
(302) 577 - 8787

STATE OF DELAWARE
DEPARTMENT OF CORRECTION
Bureau of Prisons
245 McKee Road
Dover, Delaware 19904

August 10, 1999

Debra S. Allen
Office of the Lieutenant Governor
Tatnall Building
Dover, DE  19901

Dear Debra:

I have reviewed the events described in your 06-28-99 letter concerning Inmate Russell Steedley, SBI
#249572, who resides at the Delaware Correctional Center in Smyrna.

Richard R. Covert, H.S.A reports, in a memorandum dated 08-03-99, that Mr. Steedley complained
of Osteo Arthritis and loss of full range of motion in his hips and knees. Dr. Miller examined Mr.
Steedley on 06-10-99 for right hip, knee and back pain. The examination revealed no edema or
swelling to the right knee and a full range of motion including the ability to walk without difficulty.
Mr. Steedley does have Degenerative Joint Disease proven by x-ray. He was seen on 05-05-99 for a
60 day pain medication renewal in response to right knee pain. Mr. Steedley was last seen on 07-19-
99 for another reason but didn't complain of knee, hip or back pain at this visit.

Warmest Regards,

Paul W. Howard
Bureau Chief

PWH/res

Phone: (302) 739-5601 / Fax: (302) 739-8221

# Exhibit 3



STATE OF DELAWARE
## OFFICE OF THE LIEUTENANT GOVERNOR

**RUTH ANN MINNER**
**LIEUTENANT GOVERNOR**

September 7, 1999


Russsel Steedley
249572
Delaware Correctional Center
P.O. Box 500
Smyrna, DE  19977

Mr. Steedley:

Attached please find a letter of response from Bureau Chief Paul Howard.  It still does not address the medical fee for chronic patients and does not include an answer to your latest letter of August 3.

I will be contacting Mr. Howard for a response to your latest letter and the fee question.

Sincerely,

Debra S. Allen
Office of the Lieutenant Governor

**Exhibit 4**

TATNALL BUILDING
DOVER, DELAWARE 19901
(302) 739 - 4151
FAX (302) 739 - 6965

CARVEL STATE OFFICE BUILDING
WILMINGTON, DELAWARE 19801
(302) 577 - 8787
FAX (302) 577 - 3019

TO:     Ms. Debra Allen
        C/O Lt. Governor's Office
        Tatnall Building
        Dover, DE. 19901

FROM:   Russell Steedley, SBI#00249572, S-1 Unit

DATE:   November 13, 2000

RE:     Requesting assistance concerning the inappropriate discontinuation of
        medical treatment of Indocin, for a medically recognized chronic
        condition

On November 12, 2000, I filed a medical grievance concerning the
discontinuation of my medical treatment. All pertinence information concerning that
matter can be found in the attached letter. However to summarize my complaint, I require
the medication called Indocin, to treat my Degenerative Joint Disease ("DJD"), which is
extremely painful and without cure and the current Health Care Provider has stopped my
treatment for no apparent reason.

This is not the first time that I have had my medication cut or halted due to an
arbitrary decision made by the contracted Medical Health Care Provider, who failed to
comply with standing Delaware Law and the NCCHC standards concerning chronic care
and treatment for all inmates (See standard P-50 of the NCCHC). The former Health Care
Provider (PHS) confirmed that my condition met those described above, and worked out
a Special Needs Treatment Plan for myself, after they too, halted my medical treatment.
That issue was resolved, through the help of your office. And firmly established that my
illness DJD is indeed a chronic condition, which requires continuous care and treatment.
For some unknown reason, the current Health Care Provider, stopped, without warning or
due notice, my treatment of Indocin.

I am only seeking that the medication that I was originally taking be reordered
and administered as before, and/or an appointment be set with a Specialist in order to
ascertain the possibility of total joint replacement if I am not to receive the appropriate
medication previously prescribed by PHS and CMS physicians.

I am currently in great deal of pain and have a discernible limp, with limited
mobility in both legs. Yet, to date, not one of the physicians for CMS has recorded these
elements of my ailment. In fact, it would seem that they would want me to make a
medical appoint every three months, for the same ongoing ailment, without presenting
my case to a Specialist, who may recommend surgery, a costly procedure over incessant
medical treatment with Indocin.

Your office was extremely helpful in this identical matter, which occurred last
year, under the former Health Care Provider. Thus, it is my hope that your office will
again take an interest in this matter and investigation as to why I am being denied

**Exhibit 5**

appropriate treatment and why I must repeatedly make medical appointments (Co-payment) for the same ongoing illness.

Any assistant that your office could contribute to this matter will be greatly appreciated.

Very truly yours,

Russell Steedley

Cc:     Georgia Perdue, Head Administrator, CMS staff
        Robert Snyder, Warden
        Officer Merson, Acting Grievance Chair
        Gilbert Steedley
        file

**Exhibit 6**

TO:        Head Administrator(s) for FCM

FROM:     Russell Steedley, inmate

DATE:      November 23, 2003

RE:        Concerns of medical toxicity and need for alternative treatment


To Whom It May Concern:

The reason why I am compelled to write this letter to your office is to express the concerns of one of FCM's physicians, Dr. Cancino. At a recent medical appointment, Dr. Cancino expressed grave concerns about my treatment with Naxproxen and Indicin. He stated that I was at risk of suffering from medical toxicity due to my continuous use of these NSAID drugs for the treatment of my DJD condition. According to the doctor, patients that use these drugs for long period of time are at risk to their harmful side-affects, such as, kidney and liver problems.

Since I was diagnosed with DJD by Dr. Miller, in 1997, all of the health care providers contracted by this prison have sought to treat my condition, as oppose to moving for surgery, with NSAID drugs. These drugs, which are pain-relievers and/or anti-inflammatory drugs, are only mildly effective in offsetting the pain engendered from my chronic condition.

However, since I have been treated with these drugs for over five years, I believe that it is time to seriously consider alternative treatment. To date, I have not been seen by a specialist as recommended by Dr. Miller a few years back. My joint disease continues to deteriorate and I am barely able to perform any exercises that require running or jogging, which directly impacts my ability to help reduce my high blood pressure and cholesterol levels. Both of which began to rise above the normal average after I started experiencing the effects of my DJD condition.

To date, my knee brace has not been replaced, while my ability to walk or stand for long periods have become increasingly more painful and difficult. I am asking your office for assistance in setting up an appointment for me to be seen by a orthopedic specialist to determine if a hip replacement operation is a viable option as oppose to treating me with NSAID drugs, which may harming my body since I have been taking them incessantly for over five years now. Any assistance that you can offer will be greatly appreciated.

Very truly,

Russell Steedley
SBI#00249572, C Unit
Delaware Correctional Center
Smyrna, DE 19977

cc: File


**Exhibit 7**

## AFFIDAVIT

I <u>Micheal D. Moore, #00276179</u>, being duly sworn, deposes and says:

I am writing this affidavit on the behalf of Russell Steedley. Russell Steedley and I were taken to see Dr. DuShuttle for evaluation on September 12, 2006. During the evaluation, Dr. DuShuttle told Russell that he definitely needed a complete hip replacement.

The doctor asked Russell how much time he had on his sentence and after Russell told him that he had a lengthy sentence, the doctor told Russell, "You are awfully young to have a hip replacement, and you probably will need the procedure done a second time at a later date." He told Russell that the only way to solve his problem was to have a complete hip replacement.

I, Micheal D. Moore, affirm that these statements are true and I was present when the diagnosis was made.

SUBSCRIBED AND SWORN before me this  8th  day of May , 200 7

Notary

my Commission expires: June 14, 2008

**Exhibit 8**

TO:        Debbie Rodweller, CMS RN

FROM:    Russell Steedley, inmate

DATE:     February 23, 2007

RE:        Medical Update for Osteoarthritis Status


Nurse Rodweller:

On February 12th, 2007, I was taken to the outside referral appointment that I initially grieved and that you said that you would take care of. I was seen by a physical therapist (Jonnice Steward for KGH). Ms. Steward examined my condition and put me through a number of physical mobility tests and concluded that my condition cannot be helped by physical therapy and that I require surgery to fix my deteriorating right hip joint. This is the same opinion that the Orthopedic, Dr. DuShuttle reached in September 2006.

Therefore, I wish to express my sincere appreciation to you and your office for following up on my grievance (# 92967) and effectively resolving that particular issue. At this point I only wish to know what my status is now that an Orthopedic, a Physical Therapist, and two of CMS physicians all agreed that there's no other viable option outside of surgery in ameliorating my condition? As previously discussed with you, I've been treated with meds for over ten years for my degenerative joint disease ("DJD") and they've only provided minimum relief to the intense pain and lack of mobility I experience daily.

Therefore, I wish to express my desire to have the procedure to correct my DJD condition as recommended by the abovementioned, as soon as it is possible. And if it is possible, could you provide me with the present status concerning the future of my DJD treatment? In other words, if said operation has been approved or is even being considered by CMS? Your cooperation in this matter is always appreciated. Again, thanks for your assistance in getting my medical referral resolved.


                                        Very truly,

                                        Russell Steedley
                                        SBI#00249572, W-1
                                        Delaware Correctional Center


cc:    Keesha West
       File:


**Exhibit 9**

Routine For: Mr. Russell Steedy                                                Feb 12, 2007
Created By: Bayhealth Physical therapy        PT: Jannice Stewart        0830 - 0900

HIP / KNEE - 38  Stretching: Hamstring (Supine)



Supporting right thigh behind knee, slowly straighten knee
until stretch is felt in back of thigh. Hold __20__ seconds.

Repeat __3__ times per set. Do __1__ sets per session.
Do __2__ sessions per day.

HIP / KNEE - 17  Strengthening: Straight Leg Raise
(Phase 1)



Tighten muscles on front of right thigh, then lift leg
__6__ inches from surface, keeping knee locked.

Repeat __10__ times per set. Do __1__ sets per session.
Do __2__ sessions per day.

HIP / KNEE - 65  Self-Mobilization: Heel Slide (Supine)



Slide right heel toward buttocks until a gentle stretch is felt.
Hold __2__ seconds. Relax.

Repeat __10__ times per set. Do __1__ sets per session.
Do __2__ sessions per day.

HIP / KNEE - 50  Hip Abduction / Adduction:
with Extended Knee (Supine)



Bring right leg out to side and return. Keep knee straight.

Repeat __10__ times per set. Do __1__ sets per session.
Do __2__ sessions per day.

HIP / KNEE - 21  Strengthening: Hip Abduction
(Side-Lying)



Tighten muscles on front of right thigh, then lift leg
__6__ inches from surface, keeping knee locked.

Repeat __10__ times per set. Do __1__ sets per session.
Do __2__ sessions per day.

BACK - 35  Lumbar Rotation (Non-Weight Bearing)

Feet on floor,
slowly rock knees
from side to side
in small, pain-free
range of motion.
Allow lower back
to rotate slightly.



Repeat __10__
times per set.
Do __1__ sets per session.
Do __2__ sessions per day.

**Exhibit 10**

Routine For: Mr. Russell Steedy
Created By: Bayhealth Physical therapy

Feb 12, 2007

TRUNK STABILITY - 24  Isometric Gluteals



Tighten buttock muscles.

Repeat __10__ times per set.  Do __1__ sets per session.
Do __2__ sessions per day.

**Exhibit 11**

# DELAWARE DEPARTMENT OF CORRECTIONS
## REQUEST FOR MEDICAL/DENTAL SICK CALL SERVICES
### FACILITY: DELAWARE CORRECTIONAL CENTER
This request is for (circle one): (MEDICAL) DENTAL MENTAL HEALTH

Russell Steebler     W-1   A12
_____     _____
Name (Print)                Housing Location

8/4/59       249572       2/24/07
_____   _____   _____
Date of Birth       SBI Number       Date Submitted

Complaint (What type of problem are you having)? The pan relief, "Vicadin" has run out and I need to see a doctor to renew treatment for Chronic joint disease.

_____       2/24/07
Inmate Signature           Date

**The below area is for medical use only. Please do not write any further.**

S: Scheduled ̄c MD/MLP. - gm

O:   Temp:_____   Pulse: _____   Resp: _____   B/P: _____   WT: _____

A:

P:

RECEIVED

NOV 2 7 2006

EDUCATIONAL MATERIAL
CORRECTIONAL MEDICAL SERVICES

E:

RECEIVED

_____       _____
Provider Signature & Title        Date & Time

FEB 2 7 2007

3/1/99 DE01
FORM#:
MED
263

**Exhibit 12**

EDUCATIONAL MATERIAL
CORRECTIONAL MEDICAL SERVICES

## AFFIDAVIT OF DAVID WILLIAMSON

1.  I, David Williamson, am the Affiant listed above and do depose and state the following in support of Williamson v. Correctional Medical Services, Inc., et al, 06-379-SLR:

2.  On 03-14-07, Affiant received reconstructive knee surgery to replace a ruptured Anterior Cruciate Ligament (ACL).

3.  DuShuttle, MD was the outside orthopedic specialist who performed the procedure.

4.  DuShuttle had read the MRI results and performed a specialized knee exam in June 2006 (circa).

5.  DuShuttle informed Affiant of the following:

    (a) Affiant had a permanent injury that would not heal on its own;
    (b) That it caused further deterioration of the knee joint and or arthritis; and
    (c) That the inherent instability of the knee joint was a significant hazard of creating falling or collapsing incidents.

6.  DuShuttle recommended the following:

    (a) Reconstructive surgery;
    (b) Special ACL "Don-Joy" knee brace; and
    (c) Post-op physical therapy.

7.  DuShuttle, however, candidly opined that the needed surgery would likely fail because he believed that CMS would refuse to provide the Don-Joy brace and would refuse to provide the –critical- physical therapy.

8.  In fact, DuShuttle stated flatly that the brace ran about one-thousand dollars, which is why CMS would refuse to provide it.

9.  For nine months after DuShuttle made his informed and professional medical judgment/recommendation, CMS refused to provide the Don-Joy brace ostensibly due to a phantom security concern.

10. Affiant filed a TRO/PI demanding the needed care and when he challenged CMS's pretext they conceded and provided the Don-Joy brace.

11. Affiant had already experienced the following due to his permanent knee injury:

    a)  Acute pain and suffering;
    b)  Significant impairment of his normal daily functions (e.g. inability to promote good health via meaningful exercise);
    c)  Significant instability of the knee joint, in which the knee would abruptly buckle out sideways or backwards at an unnatural angle; and
    d)  The above would conspire to result in a significant risk of likely future permanent injury.

12. Though, DuShuttle made the recommendations listed above, CMS refused to provide any care whatsoever for some nine months, and Affiant was forced to seek redress in the U.S. District Court for the District of Delaware in order to force CMS to provide the necessary care.

13. CMS's actions, to deny needed care and or create an inordinate delay, were not rooted in any legitimate medical factors, or in any exercise of professional medical judgment. They were actually based in CMS's custom/policy of cost-avoidance.

14. The above is true and correct, and it is based on Affiant's personal observations and experiences.

Sworn and subscribed before me this 25, April 2007.

David Williamson, SBI # 183022

Notary Public

**Exhibit 13**

**DCC  Delaware Correctional Center**
Smyrna Landing Road
**SMYRNA DE, 1997**
Phone No. 302-653-9261

Date: 06/04/2007

## GRIEVANCE REPORT

| OFFENDER GRIEVANCE INFORMATION | | | |
|---|---|---|---|

**Offender Name :** STEEDLEY, RUSSELL E     **SBI#** : 00249572     **Institution** : DCC

**Grievance #** : 117326     **Grievance Date** : 05/30/2007     **Category** : Individual

**Status** : Unresolved     **Resolution Status :**     **Resol. Date** :

**Grievance Type:** Health Issue (Medical)     **Incident Date** : 05/29/2007     **Incident Time :**

**IGC** : McCreanor, Michael     **Housing Location :** Bldg W1, Tier H, Cell 13, Single

| OFFENDER GRIEVANCE DETAILS |
|---|

**Description of Complaint:** Health Care Provider (CMS) ran out of Vicodine medication over the entire Memorial Day week end. I was given an alternative pain reliever for excruciating DJD condition.

**Remedy Requested** : Total hip replacement as recommended by Dr. DuShuttle and other medical experts.

| INDIVIDUALS INVOLVED | | |
|---|---|---|
| **Type** | **SBI #** | **Name** |

| ADDITIONAL GRIEVANCE INFORMATION | |
|---|---|

**Medical Grievance :** YES     **Date Received by Medical Unit :** 06/02/2007

**Investigation Sent** : 06/02/2007     **Investigation Sent To** :

**Grievance Amount :**

## Exhibit 14

TO:        Warden Thomas Carroll

FROM:    Russell Steedley, Inmate

DATE:    June 13, 2007

RE:        Denied of Adequate Medical Care & CMS's Illegitimate Chronic Care
            Policy

To Warden Carroll:

  I am being denied adequate medical treatment by the current Health Care Provider (CMS), solely due to economic purposes. I have filed a Grievance regarding this situation or others that are closely related to this issue, but all have been denied by CMS. They based all of their decision on a non-medical terms or condition or in the case of chronic care clinics, they are blatantly contravening established Delaware law.

  For over ten years I have been plagued by a debilitating physical condition called Osteoarthritis or Degenerative Joint Disease ("DJD"). However, all of the contracted health care providers, past and present, by this prison have refused to take the appropriate measures to remedy my situation. Rather they have opted to take the cost saving method of supplying me with various pain-reliever medications over corrective surgery, despite the recommendations by medical experts. Now CMS has invoked an illegitimate policy that would force myself and others who are similarly situated (all having a medically recognized chronic condition) to pay for all of our medical appointments and treatment that are classified as chronic care. They are now claiming that they only have seven chronic care clinics and therefore, despite the fact that an inmate/patient condition may be considered chronic, inmates would still have to pay for all appointments and treatment.

  If I am forced to follow that policy, my annual medical bill would approach $72.00 a year, and it would have cost me around $720.00 since I was diagnosed with my DJD condition. This doesn't take into consideration my other chronic care conditions (Cluster Headaches) that aren't covered by CMS's new policy.

  However, this is not the first time that CMS or any other health care provider has tried to pass this illegal policy. In accordance with, Delaware State Law 11 Del.C. § 6536 (b) and (c), which states: "…no inmate shall be charged for medical appointments, who have a chronic illness…" CMS new policy is illegal. The fact that they only have seven chronic care clinics is irrelevant. Since they are contractually obligated to provide medical care and treatment for all of the inmate population in Delaware, they must adhere to this law. The current Governor, when she was the Lt. Governor supported my position on this very same issue when CMS, FCM, and PHS (all contracted by this prison) tried to enforce this very same policy under the same argument – *we have limited chronic care clinics*. (See attached Supporting Documents). The Governor's office concluded that, "no inmate who has a diagnosed chronic condition should be forced to pay for follow-up appointments and treatment after an initial medical appointment."

  In my case, I am being forced to pay for treatment that could be adverted if CMS administrators followed the medical advice of its' physician, Dr. Van Dusin; the medical expert who examined my hip, Dr. DuShuttle, an Orthopedic; and the Physical Therapist

# Exhibit 15

from KGH. All were unanimous in their decision that I need a total hip replacement. All of my Grievances concerning these two issues appear to be in a state of perpetual limbo.

Therefore, I am asking your office to get involved in this matter. CMS's polices are in error and seemed to be set to made money at the expense of the indigent population here, despite the Delaware law that specifically covers chronic care treatment. Your cooperation in this matter will be greatly appreciated.

Very truly,

Russell Steedley, inmate
SBI#00249572, W-1
Delaware Correctional Center


cc:    Keesha West-Steedley
       Commissioner Danberg
       ACLU
       File

**Exhibit 16**

Russell Steedley
SBI#00249572, W-1
Delaware Correctional Center
1181 Paddock Rd.
Smyrna, DE 19977

June 22, 2007

Carl Danberg, Commissioner
Bureau of Corrections
Administration Bldg.
245 McKee Rd.
Dover, DE 19904

RE: CMS's Inappropriate Cost Saving Policies

Dear Commissioner Danberg,

I am seeking your assistance concerning my chronic medical condition in which CMS, the contracted health care provider at D.C.C., refuses to provide adequate care. At my last medical appointment, June 18, 2007, I was told by the treating Nurse Practitioner, that CMS's administrators have refused to follow the recommendations offered by their own physicians and that of Dr. DuShuttle, an orthopedic specialist/surgeon. All of the medical experts that have reviewed my case have expressed serious concerns about my Osteoarthritic or Degenerative Joint Disease ("DJD") condition that's in my right hip joint. I was diagnosed with DJD, a chronic condition over ten years ago and have been treated with pain-relief medication ever since.

To date, all of my Grievances have been denied and are awaiting the second level of this process. However, during that last medical appointment I was also told that my latest blood tests revealed that I am already experiencing some negative side-affects from the years of using the prescribed pain-relievers and anti-inflammatory drugs that are directly impacting my kidneys. At that medical appointment, Nurse Practitioner Ihuma, who revealed this information to me, then placed me on another prescription drug specifically to combat those adverse effects that my current prescription has produced. However, this treatment would not be necessary if CMS's administrators gave their approval for the total joint replacement surgery recommended by the above listed physicians.

Dr. Van Dusin has expressed fears that my DJD condition may be necrosis, which means that the injured joint may be dying. If the joint is allowed to die, my leg would have to be amputated or I would die. Additionally, Nurse Practitioner Ihuma stated that if my kidneys are allowed to continue to deteriorate, I might have to be placed on a dialysis machine, which

**Exhibit 17**

will be inevitable concerning CMS's current treatment for me. In both cases, the cost saving policies of CMS's are directly contributing to my deteriorating condition and health, which is having a pernicious impact on my life. There has been no plausible medical explanation given as to why CMS's administrators continue to put off the corrective surgery, which would remedy my medical problems.

When you and I met a month ago at the Education Department of D.C.C. you ask that I first exhaust the Grievance process before submitting an appeal to your office. However, with this latest alarming medical information concerning my malfunctioning kidneys, concomitant with Dr. Van Dusin's fears that my DJD condition may develop into necrosis in the damaged joint, I felt the need to bring this to your attention now, because by the time Grievance process reaches fruition, irreparable damage may have set in and it will be too late to act.

Since this medical issue and others similarly related are not isolated and have much history behind it, I will forward to you a copy of some supporting documentations.

Any assistance that your office can provide in this matter will be greatly appreciated. Thanks in advance for your time, patience, and cooperation.

Very truly,

Russell Steedley, Inmate

cc:    Keesha West-Steedley
       Gilbert Steedley
       CMS
       File

**Exhibit 18**

## GRIEVANCE INFORMATION - Appeal

### OFFENDER GRIEVANCE INFORMATION

| | | | |
|---|---|---|---|
| **Offender Name :** STEEDLEY, RUSSELL E | **SBI#** : 00249572 | **Institution** : DCC | |
| **Grievance #** : 106965 | **Grievance Date** : 04/10/2007 | **Category** : Individual | |
| **Status** : Unresolved | **Resolution Status :** | **Inmate Status :** | |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 04/10/2007 | **Incident Time :** | |
| **IGC** : McCreanor, Michael | **Housing Location :** Bldg W1, Tier H, Cell 13, Single | | |

### APPEAL REQUEST

Grievance Hearing Date: June 26, 2007
MGC Decision: Uphold
Grievance Status: Unresolved
Appeal Received: June 27, 2007

I am appealing the Level II decision that states: CMS Administrators are postponing any decision regarding the operation on my hip while awaiting furthter information from Dr. VanDusen because any further delay in moving forward with the surgery to repair my right hip only exacerbates my condition and suffering while in exorably leads to irreversible damage to both my kidneys and right leg. I am currently being treated with Indocin and Vicodin for my osteo-arthritis, which is a chronic condition. Yet, according to CMS' new policy, I'm required to pay for all medical appointments and treatment. THis policy is in direct violation of Delaware law II Section 6536 (b) and (c). In addition, Nurse Practioner Ihoma stated that my kidney problems are a by product of long term use of pain relievers and anti-inflamatory drugs that CMS and all other contracted Health Care Providers have prescribed as treatment for my chronic hip problem.

### REMEDY REQUEST

## Exhibit 19

**DCC  Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone No. 302-653-9261**

Date: 07/09/2007

## GRIEVANCE INFORMATION - MGC

### OFFENDER GRIEVANCE INFORMATION

| | | | |
|---|---|---|---|
| Offender Name : STEEDLEY, RUSSELL E | | SBI# : 00249572 | Institution : DCC |
| Grievance # : 106965 | | Grievance Date : 04/10/2007 | Category : Individual |
| Status : Unresolved | | Resolution Status: | Inmate Status : |
| Grievance Type: Health Issue (Medical) | | Incident Date : 04/10/2007 | Incident Time : |
| IGC : McCreanor, Michael | | Housing Location : Bldg W1, Tier H, Cell 13, Single | |

### MGC

Date Received :                     Date of Recommendation: 07/02/2007

### GRIEVANCE COMMITTEE MEMBERS

| Person Type | SBI # | Name | Vote |
|---|---|---|---|
| Staff | | Eller, Gail | Uphold |
| Staff | | Washington, Deborah | Uphold |
| Staff | | Courtney, Christina | Uphold |
| Staff | | McCreanor, Michael | Abstain |

### VOTE COUNT

| Uphold : 3 | Deny : 0 | Abstain :1 |
|---|---|---|

### TIE BREAKER

| Person Type | SBI # | Name | Vote |
|---|---|---|---|

### RECOMMENDATION

Grievance Hearing Date: June 26, 2007
MGC Decision: Uphold
Grievance Status: Unresolved
Appeal Due: July 3, 2007

May 26, 2007 requested additional information . Follow up on prgress of consult. Physical therapy recommendations were to do strengthing exercises and no follow up required.

Page 7 of 7

# Exhibit 20