IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RUSSELL STEEDLEY                              )
    Plaintiff,                               )
                                             )
v.                                           ) Civil Action No. 07-448-***
                                             )
CORRECTIONAL MEDICAL SERVICES,               )
GAIL ELLER, JOHN RUNDLE, and                 )
SCOTT ALTMAN.                                )
    Defendants.                              )

**FILED**

**JUL 2 5 2008**

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

PLAINIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

    Plaintiff, Russell Steedley, comes now pursuant to Fed.R.Civ.P., Rule 56 and

submits this response to the defendants' motion for summary judgment. Plaintiff opposes

defendants' motion for summary judgment and submits that the defendants have failed to

meet their burden of demonstrating that there is no dispute as to any material fact, and

because the facts set forth in plaintiff's Complaint and Amended Complaint, with

attached evidence show that defendant's violated plaintiff's clearly established

constitutional rights. Plaintiff is a pro se litigant and he seeks pleading leniency under

Haines v. Kerner, 404 U.S. 519 (1972).

STANDARD OF REVIEW

    The Supreme Court has held officials are constitutionally responsible for the

medical needs of inmates that are considered serious and when officials actually know

about an inmate's serious medical needs, but fail to respond reasonably by providing

adequate treatment. Estelle v. Gamble, 429 U.S. 97 (1976). Deliberate indifference can be

"inferred" or "found" from the facts, if the officials failed to respond reasonably to a

known risk. Farmer v. Brennan, 511 U.S. 825 (1984). To demonstrate a prima facie case

of cruel and unusual punishment based on the denial of medical care, a plaintiff must establish that defendants acted with deliberate indifference to his or her serious medical needs. Estelle, 429 U.S. at 104: Durmer v. O'Carroll, 991 F.2d 64, 67 (3rd Cir.1993). This standard has two elements:

1) Plaintiff must make an "objective" showing that the deprivation was "sufficiently serious," or that the result of defendant's denial was sufficiently serious;

2) Plaintiff must make a "subjective" showing that defendant acted with a sufficiently culpable state of mind."

See: Wilson v. Seiter, 501 U.S. 294, 298 (1991). A defendant can be held liable to plaintiff if it instituted a policy or custom that demonstrates deliberate indifference. Monell v. Dep't of Social Services. 436 U.S. 658, 694 (1979). In addition, an official will be liable under section 1983, if they establish or carry out a policy that results in a violation of plaintiff's constitutional rights. Swint v. City of Wadley, 51 F.3d 988, 999 (11th Cir.1995).

## FACTUAL ISSUES IN DISPUTE

Plaintiff disputes the defendants' entire version of factual events in their motion for summary judgment. (D.I. #47). Plaintiff offers the following facts, using the defendants' submitted summary judgment evidences (D.I. #48, Exhibits), which after closer examination, clearly supports plaintiff's contention that the defendants' were deliberately indifference to his apparent serious medical needs.

In essence, the defendants argue that the final approval for plaintiff's surgery was authorized by "unknown" CMS staff or corporation when all conservative measures were "exhausted" and "failed," concomitant with Dr. DuShuttle's October 2nd, 2007, recommendation to go ahead with the operation. The defendants buttress this point by

2

comparing DuShuttle's two separate consultation appointments notes/comments that took place on 9/12/06 and 10/2/07. The plaintiff's medical records along with additional . evidence tell a different story.

1. Stipulated, that prior to the 1/21/08 surgery, plaintiff suffered from a medical condition called "severe Osteoarthritis or degenerative joint disease ("DJD"), in his right hip. See: Defendants' Summary Judgment Exhibits A (D.I.#48, at 18).

2. Stipulated, that the defendants assumed the duties and responsibilities as caretaker and medical provider as the contracted Health Care Provider ("HCP") for Delaware Correctional Center ("DCC"), in Smyrna, from July 2005 to the present. Disputed, that defendants provided reasonably adequate and/or appropriate medical care for the plaintiff during their latest tenure as HCP for DCC.

3. Stipulated, according to plaintiff medical records in August 2006, NP Ihuoma Chuks noted in the first consultation request form, in the *Describe Signs & Symptom* section, of that form: "I/M [inmate] seen today for result of hip X-Ray. Reports increase in severity of hip pain; have hip osteoarthritis for over 10 years, but problem getting increasingly worse. Unable to do anything due to pain." (D.I.#48, at 18). Disputed, that plaintiff was not in pain or suffering significantly due to his DJD condition and that his suffering went on for years.

4. Stipulated, that defendants continued to treat plaintiff's DJD condition with palliative drugs, even after NP Chuks listed in the Consultation Request form that the Analgesic therapies in the "Failed Outpatient Therapies" section of that form. Disputed, that CMS wasn't already aware that the conservatives therapies had failed. (D.I.#48, at 18).

3

5. Stipulated, that NP Chuks specifically requested an Orthopedic consultation for plaintiff due to sever pain, failed therapies, and other factors listed in her consultation request form, such as: [plaintiff is] ambulating with cane, gait very unsteady, decrease range of motion ("ROM") in right hip, pain." (D.I.#48, at 18).

6. Stipulated, that an Orthopedic appointment was made with Dr. DuShuttle on 9/12/06, in Dover, Delaware. Disputed, that at that appointment Dr. DuShuttle only recommended that "plaintiff should live with pain for as long as possible…" as described by defendants' summary judgment motion. See (D.I.#47, pg. 6).

7. Stipulated, that DuShuttle advised the plaintiff that he would probably outlive the replaced joint and therefore would require another operation some 10 to 15 years later. Disputed, that DuShuttle noted or claimed that the plaintiff was "too young for a total hip replacement, although he is a candidate" and that DuShuttle recommended physical therapy at any time. Defendants erroneously attributed notes and comments made by CMS's staff to DuShuttle. A closer examination of the Provider Consultation Report clearly reveals CMS's staff wrote those remarks. (D.I.#48, at 20)

8. Stipulated, that DuShuttle offered plaintiff a clear choice at the 9/12/06 appointment, to either live with pain or get the surgery. (D.I.#48, at 20 & 22). Plaintiff opted for the surgery, despite the risk, due to the unrelenting pain in his joints. See: (Plaintiff's Exhibits, Exhibit page 1, paragraph 4, 5, & 6. and Exhibit 2)

4

9. Disputed, that DuShuttle penned or marked "No further action" [to be taken] box in "Provider Consultation Report." Defendants CMS filled out the part of the form. (D.I.#48, at 20)

10. Stipulated, that defendants knew that plaintiff was a candidate for surgery. Disputed, that CMS chose to opt for further Analgesic Therapies was reasonable medical option that was based on legitimate medical reasoning, given NP Ihuoma's initial Consultation Request report. (D.I.#48, at 18 & 44)

11. Stipulate, that defendants' physician continued to treat plaintiff painful condition with ineffective palliative drugs. Disputed, that plaintiff received his pain relief drug treatment as prescribed by CMS's physicians in a timely manner due to numerous and various snafus in their drug dispensing and reordering system. Defendants' evidence document a long history of a broken system along with plaintiff's Medical Grievance. See (D.I.#48, at 6, 7,12, 13, 28, 29, 38 & 39); and (Plaintiff's Exhibit #3). Disputed, that all Sick call requests were honored or scheduled when CMS staff placed them into their computer system.

12. Stipulated, that plaintiff was recommended to be seen by a Physical Therapist. Disputed, that this recommendation was a result of DuShuttle's recommendation or by Dr. VanDusen. See (D.I.#48, at 23 & 24). Dr. Durst actually submitted the consultation with the intent of seeking a second opinion to convince CMS's administrator(s) to approve of the operation because he feared that the plaintiff hip condition may have necrosis, a deadly disease that could result in loss of limb.

13. Stipulated, that the Physical Therapy session was held in February 2007, some five months after Dr. Durst original request. The plaintiff was forced to file two

5

additional Sick Call forms, a Medical Grievance, and a formal letter to CMS's administrator(s) to get that request honored. See (D.I.#48, at 27 & 28) and (Plaintiff's Exhibits 4& 5).

14. Stipulated, that plaintiff strongly desired the operation that DuShuttle offered him (and CMS) at the 9/12/06 appointment, as opposed to living with the pain that conservative therapies failed to alleviate or mitigate. See (D.I.#48, at 41). Disputed, that the defendants' CMS were already working to have plaintiff reevaluated by an orthopedic specialist after the conservative therapies were deemed to have failed.

15. Stipulated, that on 1/18/07, Dr. VanDusen feared that the plaintiff would lose his leg to necrosis and he again acknowledged that all "Outpatient Therapies," which now included Vicodin and Indocin drugs had utterly failed. VanDusen moved for another orthopedic consultation with DuShuttle. See (D.I.#48, at 44 & 47). VanDusen's consultation request notes summed up plaintiff's situation: "Intractable pain from Avascular Necrosis right hip…Failed Outpatient Therapies, [including] PT." See (D.I.#48, at 47).

16. Stipulated, on 2/6/07, that the defendants CMS's evidence show that they stalled, postponed, delayed, and denied plaintiff's operation in face of overwhelming pain and discomfort, when they continued to claim they needed "…additional information," before they can approve the operation. See (D.I.#48, at 45).

17. It would take three consultation requests by VanDusen before the plaintiff would be considered to be seen by DuShuttle for surgery, 1/18/07, 5/7/07, and in August

2007, by CMS's administrators and/or company. See (D.I.#48, at 34, 37, 44, & 47).

18. Stipulated, that in the 2/6/07, X-Rays Report, which were ordered by Dr. Durst in October 2006, revealed, "severe chronic changes at the right and left hip joints." The report also added that, "…at the hip joints where there appears to be irregularity and deformity…there is lucency and sclerosis." Disputed, that CMS administrators were not aware of this and other pertinent reports regarding plaintiff's DJD condition. See (Plaintiff's Exhibit #5) and (D.I.#48, at 45).

19. Stipulated, that plaintiff was taken to a Physical Therapist appointment on 2/12/07. Disputed, that plaintiff performed any exercises, other than trying to touch his toes by bending at the waist, and some deep knee bends, all of which the plaintiff performed with some difficulty. The Therapist quickly realized that the plaintiff range of motion in both hip joints were severely limited, as indicated throughout his medical records and recommended a light exercise regiment (in a pamphlet), stating that there's nothing we can do for you here.

20. Stipulated, that on 3/2/07, NP Chuks ordered an extensive labwork (Blood tests) on the plaintiff, after discovering through previous blood tests that the plaintiff's kidney functions were diminishing. She attributed the kidney problems directly to plaintiff's 11 years of NSAID (pain-relief) drug treatment.

21. In April 2007, plaintiff filed a Medical Grievance (#106965) requesting that CMS follow Dr. DuShuttle's 9/12/06 recommendation, to give plaintiff that

7

operation because the pain had become unbearable and the medication did nothing to stem the pain. That Medical Grievance was denied.

22. Stipulated, that on 5/7/07, VanDusen placed a second consultation request for the plaintiff to be seen by DuShuttle. VanDusen appeared confused and angered by CMS's refusal to approve of the consultation request for the operation for the plaintiff. (D.I.#48, at 34 & 37). Disputed, that VanDusen or any other CMS physician failed to recommend an operation for plaintiff.

23. In June 2007, NP Chuks expressed further concerns about plaintiff's DJD condition and his kidneys problems. She checked on VanDusen's second consultation request dated 5/7/07, but informed the plaintiff that the decision was being held up by CMS administrators. (D.I.#48, at 39). When ask who these administrators were, NP Chuks would not divulge their names. See (Plaintiff's Exhibit #1, ¶14).

24. On June 26, 2007, plaintiff had a Medical Grievance hearing at the Level II, for MG#106965, with CMS staff, including Gail Eller, Director of Nurses for CMS at the time. Eller refused to approve of the operation option that DuShuttle offered in 912/06, but rather postpone in making the decision that would have provided the only relief to plaintiff's daily suffering, which would have also eliminated the need to treat plaintiff with the same drugs that were negatively impacting his kidneys. See: (Plaintiff's Exhibits #6, and Exhibit #1, ¶15). Disputed, that CMS was working on exhausting conservative therapies and an appointment follow-up appointment with orthopedic specialist.

25. Stipulated, that in July 2007, plaintiff filed a 1983 Civil Suit, along with
    TRO/PI Motion to compel the defendants' CMS to stop using stalling,
    delaying, postponing, and denial tactics, that were motivated by their cost-
    saving policies/customs, and provide plaintiff with the medical procedure that
    DuShuttle recommended that would stop plaintiff's pain and suffering.
    Disputed, defendant's statement in (D.I.#47, on page 11), that "In fact,
    CMS...attempted to treat Plaintiff's with conservative measures until the
    consulting orthopedic surgeon, Dr. DuShuttle, recommended that surgery be
    performed." Referring to the second (10/2/07) appointment.

26. On 9/26/07, the plaintiff attended a second Medical Grievance hearing at
    Level II, for the same MG#106965. There, Nurse Gail Eller and other
    members of CMS staff informed the plaintiff that his operation was finally
    approved and that he should be taken out to receive that operation within a
    couple of months, no later. See: (Plaintiff's Exhibit #7). This meeting was
    held before second appointment with DuShuttle and after the filing of 1983
    Civil Suit.

27. Stipulated, that the plaintiff was taken to see DuShuttle on 10/2/07. Disputed,
    that plaintiff was taken see to DuShuttle for recommendation and/or approval
    of surgery, because that decision was reached by CMS already.

28. Stipulated, that on 1/21/08, the plaintiff received a total hip replacement
    operation on his right hip after twelve years of un-mitigating pain and
    suffering, and additional medical problems directly attributed to the

9

Conservative therapies/treatment provided by CMS. See (Plaintiff's Exhibit, #1, ¶21).

29. Plaintiff spent over four months in the prison's infirmary recovering and rehabbing from January 21, 2008, operation. Plaintiff was released on May 28th, 2008, from the infirmary.

30. Stipulated, that John Rundle held the Health Service Administrator's position; and Scott Altman was the Quality Assurance Supervisor for inmates for CMS at DCC, during the relevant period. (D.I.#47, Exhibits B). Disputed, that Ronnie Moore, the current Health Service Administrator for CMS, was present or witnessed the activities of Rundle or Altman, his predecessors. Disputed, that Rundle and Altman were not involved in the daily activities of CMS as supervisors and overseers of inmates' complains and Medical Grievances. Disputed, that they were not carrying on CMS's cost-saving practices and customs.

31. Stipulated, that plaintiff's DJD condition was a universally recognized as a chronic condition. Disputed, that CMS's cost-saving policies excluded considering plaintiff's long-standing illness as chronic, therefore, plaintiff was expected to pay for every medical appointment that related to his DJD condition, which also included charging him for treatment. (Plaintiff's Exhibits, #13). CMS's Chronic Care Clinic policy is contrary to Delaware Law, that specially states that "The Department shall not charge an inmate for…visits resulting from chronic medical condition." See: Title 11 Del.Law Section 6536(b); also (Plaintiff's Exhibits, #14).

10

## ARGUMENT

A. Statute of Limitation Commence on September 12, 2006, After Medical Expert Confirmed Plaintiff's DJD Condition was Serious and Required Surgery to Alleviate His Suffering.

As noted in defendant's Summary Judgment Motion (D.I.#47, pg.12), "...a prisoner has no right to a specific form of medical treatment," so long as the treatment provided is reasonable. Poole v. Taylor, 466 F.Supp. 2d 578, 589 (D.Del.2006)(citing Harrison v. Barley, 219 F.3d 132, 138-40(2nd Cir.2000). Plaintiff's medical condition was diagnosed as serious after CMS's Nurse Practitioner Ihuoma Chuks placed a Consultation Request form for the plaintiff to be seen by an Orthopedic Specialist. The Consultation Request was made after an August 2006, evaluation of plaintiff's medical records, X-Rays, and personal observation. Chuks noted that all pain-relief therapies had "failed," and that the pain produced by plaintiff's DJD condition had "...increased in severity," therefore, she submitted the request seeking, "...other possible treatment." See (D.I. #48, Exh. #18)

A medical consultation appointment was made for plaintiff on September 12th, 2006, where orthopedic specialist Dr. Richard DuShuttle offered the plaintiff the option of surgery to alleviate his suffering. (D.I. #48, Exh. #20 & 22). A medical need is serious if it is one that has been diagnosed by a physician as mandating treatment. Hill v. Dekalb Regional Youth Detention Center, 40 F.3d 1176, 1187 (11th Cir.1994). The medical operation offered by DuShuttle was the only treatment available and offered, as opposed to trying to live with the pain. Plaintiff agreed to the operation because the pain was unbearable. (See Plaintiff's Exhibits #1, 2, & 9).

After DuShuttle's appointment and recommendations along with NP Chuks August 2006, medical evaluation, the defendants' CMS applied non-legitimate medical factors to

11

delay, postpone, stall, and deny plaintiff the only medical treatment offered by DuShuttle. Applying cost-saving practices and tactics, the defendants ignored their own physicians request for another consultation appointment with DuShuttle in order to give the plaintiff an operation. (D.I. #48, Exh. #34, 37, 45 & 47). The earliest request was placed in January 2007, by VanDusen. Sherrod v. Lingle, 223 F.3d 605, 611-12 (3rd Cir.2000); and Boswell v. Sherburne County, 849 F.2d 1117, 1123 (8th Cir.1998).

B. Deliberate Indifference Standard Clearly Established.

It may be considered deliberate indifference on the defendants' part for medical treatment that's provided where the defendants intentionally decide to take an easier or cheaper, but much less effective curse of treatment. Sherrod v. Lingle, 223 F.3d 605, 611-12 (3rd Cir.2000). Deliberate indifference may also exist if the defendants continue with a course of treatment in the face of resultant pain and risk to permanent injury. White v. Napolean, 897 F.2d 103, 109-111 (3rd Cir.1990). The defendants chose to enforce a cost-saving policy by opting to allow plaintiff to suffer must be deemed unreasonable especially in the face of their own physicians' claims that all of the pain-relief therapies had "failed." Yet, CMS's administrators refused to acknowledge    VanDusen's recommendations to sent the plaintiff to DuShuttle for surgery. (D.I. #48, Exh. #34, 37, 45 & 47). Also (D.I. #48, Exh. #45). (..."Request for additional information"); and (Plaintiff's Exhibit #3, 4, 5, & 6).

In the McGuckin court, a serious medical need was defined as having five specific factors that must be established. See McGuckin v. Smith, 974 F.2d 1050, 1061.

1.    A medical need is serious if it is one that has been diagnosed by a physician as mandating treatment. Hill v. Dekalb Regional Youth Detention Center, 40 F.3d

12

1176, 1187 (11th Cir. 1994). DuShuttle's two consultation appointment notes and plaintiff's operation confirms the seriousness of his condition.

2.   A need is serious if it is one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. See (Plaintiff's Exhibit, #9, ¶9 & 10).

3.   A serious medical need causes pain. The plaintiff's entire medical record attests to this factor. (D.I.#48, Exh.# 18, 47, & 49).

4.   Significantly affects an individual's daily act. NP Chuks noted that "…unable to do anything due to pain," in her August 2006, assessment of plaintiff's condition. Also see: (Plaintiff's Exhibits, #10 ¶16a to 16g, & ¶27b).

5.   If the medical condition offers the possibility of a life-long handicap or permanent loss. The plaintiff's DJD condition was diagnosed as a painfully chronic condition and that condition along with the adverse affects directly derived from the pain-relief treatment engendered medical problems such as, hypertension, kidney problems, irregularity & deformity to the joint, to the possible loss of limb due to Vascular Necrosis in the joint. (D.I.#48, Exh. #18, 39, 41, 46, & 47).

The defendants claim that they provided extensive and reasonable treatment throughout their tenure prior to finally moving to approve of the operation. They buttress their claims by referencing the numerous Sick Call and Chronic Care appointments and medical examinations found in the plaintiff's medical records. However, providing care that is ineffective and/or cheaper in cost at the expense of the plaintiff's suffering, in light of DuShuttle's surgical option cannot be deemed

13

reasonable or appropriate. Multiple contacts with a medical provider or personnel do not always preclude a finding of deliberate indifference. Hunt v. Upoff, 199 F.3d 1220, 1224 (10th Cir.1999). While CMS's physician can be credited with pursuing DuShuttle's surgical option, CMS's administrators and/or officials delayed, stalled, postponed, and denied approving of that operation and continued to ignored their physicians' requests for a consultation appointment with DuShuttle after medication, such as Vicodin and Indocin were proven ineffective "again" in January 2007. (D.I.#48, Exhibit, #44). Also see: (Plaintiff's Exhibits, #8, 11, &12).

The plaintiff was forced to file a 1983 Complaint, along with a TRO/PI motion, due to CMS's unreasonable denials and delays to approve of the operation that DuShuttle recommended. CMS only approved of the operation after the 1983 Complaint was filed. CMS's attempts to rely on DuShuttle's October 2, 2007, appointment and recommendation are nothing more than a red herring, that fall short in the face of plaintiff's evidence that clearly show that CMS staff had already agreed to give the plaintiff the operation on September 26, 2007, at a Medical Grievance hearing. (Plaintiff's Exhibit, #7).

Clearly, CMS made their decision to provide plaintiff with the operation before October 2, 2007, as stated in their Summary Judgment claims. Therefore, the only logical conclusion that can be reached is that CMS moved for the operation because of the plaintiff's 1983 Complaint and TRO/PI motion. Or they based their decision on DuShuttle's September 12, 2006, recommendation. In either case, the defendants' relied on non-legitimate medical reasons for delaying that decision and allowed the plaintiff to suffer immeasurable pain by their applying cost-saving practices.

14.

A lengthy delay in providing [medical] care or one that results in serious pain or permanent damage violates the constitution. See Martin v. Tyson, 845 v. 1451, 1457(7th Cir.1998). CMS's delaying and postponing tactics also contributed the plaintiff suffering additional serious medical problems, such as kidney problems. See (D.I.#48, Exhibit at 41). Lopez v. Smith, 203 F.3d 1122, 1132 (9th Cir.2000).

> 1. As Supervisors and Administrators for CMS, John Rundle and Scott Altman Held Positions of Authority Which Advanced CMS's Cost-Saving Practices and Customs, Which Directly Contributed to the Plaintiff's Suffering.

On January 21, 2008, the plaintiff eventually received the operation on his severely damage and painful right hip. That surgical procedure had to be approved by CMS Corporate Headquarters in St. Louis, before it could take place. The process of getting that approval initially starts with a CMS's doctor's consultation request, then reviewed by CMS administrators, and then forwarded to CMS Corporate Headquarters for final approval via "CMS OP Review Communication Form." See (D.I.#48, Exhibit at 45). However, according to NP Ihuoma Chuks and Gail Eller (the former Director of Nurses for CMS), both of whom were subordinates of Rundle and Altman, the CMS administrators were the ones holding up approval for plaintiff's operation by denying and postponing all of Dr. VanDusen's requests for consultation for the operation. See (Plaintiff;s Exhibits #1 and 17).

It is irrefutable that on January 18, 2007, VanDusen found that the Outpatient Therapies of Vicodin and Indocin had "failed." See (D.I.#48, Exhibit at 44). VanDusen submitted the first of three consultation requests for plaintiff to be seen by DuShuttle for

15

the operation to fix his right hip and to stop his suffering. It is irrefutable that CMS refused to acknowledge those consultation requests.

Rundle was directly notified of the plaintiff's condition. See (Plaintiff's Exhibit #5). And as the Head Service Administrator, Rundle also oversaw the Medical Grievance process, which the plaintiff filed several regarding his DJD situation. See (Plaintiff's Exhibit #3, 4, 6, & 7). And Altman's responding letter to another inmate's medical issue as Quality Assurance Supervisor for Inmates, at DCC, clearly demonstrates his authority and position during the relevant time period. See (Plaintiff's Exhibit #22). It is apparent that these documents along with Rundle and Altman's positions of authority established them as pivotal vessels to furthering CMS's cost-saving policies/customs. And medical documents, such as the "CMS OP Review Form," where the stalling and postponing tactics were evident, ("…Request additional information") confirms the culpability of CMS's entire supervisory staff and home headquarters. See (D.I.#48, Exhibit at 45). The filing for summary judgment before the Discovery process could convene is just another part of CMS's tactics employed to evade blame.

In addition, the testimony/affidavit of Ronnie Moore appears to have been made in bad faith and it violates the personal knowledge requirements of Rule 56(e) and Fed.R.E., 602 and 1002. Moore had absolutely no personal knowledge of his predecessors' day-to-day decisions during the relevant period nor any involvement with the plaintiff's case. Moore was hired by CMS after the 1983 Complaint was filed and after the decision to operate on plaintiff was reached. Therefore, he was not in the position to testify to Rundle and Altman's conduct and actions prior to his hiring. An official will be liable under Section 1983, if they establish or carry out a "policy" that

16

results in a violation of one's constitutional rights. Swint v. City of Wadley, 51 F.3d 988, 999 (11th Cir.1995); see also Camilio-Robles v. Hayes, 151 F.3d 1, 6-7(1st Cir.1998)(Supervisor may be found personally involved in deprivation of rights in several ways: "[He], after learning of the violation through a report or appeal, may have failed to remedy the wrong…[He] may be liable because he [] created a policy or custom under which unconstitutional practice occurred, or allowed such a policy or custom to continue…" See Blyden v. Mancusi, 186 F.3d 252, 264 (2nd Cir.1999).

Rundle and Altman cannot evade responsibility and culpability simply based on Moore's opinion (not facts witnessed) or Rundle's own self-serving affidavit claiming that he "has no authority to approve or delay surgical procedures for inmates." Both affidavits and statements run contrary to his subordinates' claim and is a disputed. See (Plaintiff's Exhibit, #17). A verified complaint containing allegations based on the plaintiff's personal knowledge is the equivalent of an opposing affidavit or declaration for summary judgment purposes. See Colon v. Coughlin, 58 F.3d 865, 872 (2nd Cir.1995). A summary judgment court should not weigh the evidence or resolve factual disputes when deciding a motion of summary judgment. It should assume the truth of non-moving party's evidence and draw all reasonable inferences in their favor. Eastman Kodak Co., v. Image Technical Servs. Inc., 504 U.S. 451, 456 (1992); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Rundle and Altman failed in their responsibility to protect the plaintiff from CMS's cost-saving policies/customs, and their denying, stalling, and postponing tactics/actions only serve to further or advance CMS's policies. Both Rundle and Altman participation in CMS's Medical Grievance process and as overseers of inmates' complains, including the plaintiff's, directly link them to cost-saving practices.

2. CMS's Corporation Enacted Cost-Saving/Avoidance Policies that Subjected
the Plaintiff to Needless Suffering Which Amounted to Deliberate Indifference.

The courts have held that prisons officials are obligated under the Eighth

Amendment to provide prisoners with adequate medical care. This principle applies

regardless of whether the medical care is provided by government employees or by

private medical staff under contract with the government. Estelle v. Gamble, 429 U.S. 97

(1976); West v. Atkins, 487 U.S. 42, 57-58 (1988); and Richardson v. McKnight, 521

U.S. 399 (1997). Furthermore, a corporation that administrators medical services at a jail

or prison – or even runs the entire facility – can be sued under Section 1983. Lugar v.

Edmondson Oil Co., Inc., 457 U.S. 922, 936-37 (1982); Street v. Corrections Corp. of

Am., 102 F.3d 810, 814 (6th Cir.1996).

To hold a corporation liable under Section 1983, [plaintiff] must show that its

official policy, custom, or action caused the violation of [his] federal rights. Austin v.

Paramount Parks Inc., 195 F.3d 715, 728 (4th Cir.1995); and Sanders v. Sears Roebuck &

Co., 984 F.2d 972, 975-76 (8th Cir.1993). A custom is a practice that is so longstanding

and well-settled that it amounts to an unspoken rule. Jett v. Dallas Indep. Sch. Dist., 491

U.S. 701 (1989)("A custom does not have to be specifically authorized or ordered by a

final policymaker.").

The plaintiff initiated his complaint against CMS at the behest of Dave

Williamson, another inmate who had recently received an ACL operation after filing a

Section 1983 Complaint along with a TRO/PI motion. See Williamson v. CMS, et al.,

C.A.No.06-379-SLR. Williamson informed the plaintiff that he was in the same

predicament as he, where CMS continued to deny his Medical Grievances and formal

complains of needless suffering with non-legitimate medical reasons. (Plaintiff's Exhibit

18

#8). Williamson added that CMS cost-saving or avoidance tactics continued until he filed his 1983 complaint and TRO/PI motion and warned the plaintiff that CMS would continue to do him the same way unless and until the plaintiff sought relief from the courts. CMS continued to deny, delay, stall, and postpone approving of the plaintiff's operation until the complaint and TRO/PI motion and Amended Complaint was filed. Shortly afterwards, CMS notified the plaintiff that they had approved of his operation. Days later the plaintiff was taken to see Dr. DuShuttle – the second consultation. Prior to the September 26th, 2007, notification by CMS, they had ignored three urgent consultation requests by Dr. VanDusen to take the plaintiff to DuShuttle for approved of the operation.

Inmate Amin Fazil Al-Amin (AKA John Howard) suffered from a similar condition as Williamson. However, unlike Williamson, Amin has not received an operation despite the recommendation from the same orthopedic specialist. See (Plaintiff's Exhibit #11). The only difference between Williamson and Amin is that Williamson filed a 1983 complaint with TRO/PI motion after he exhausted the grievance process. Amin has yet to file a suit against CMS, therefore, they continue to apply their tacit cost-saving/avoidance policies or customs that allows them to make or save money by offering cheater and less effective treatments.

The only logical conclusion that can be drawn from the above statements is that CMS corp. will continue to utilize cost-saving/avoidance practices on all inmates in their care until that inmate seeks relief from the courts. The plaintiff wrote to the Warden and Commissioner for DCC, expressing his concerning regarding CMS cost-saving practices that was causing him so much pain. See (Plaintiff's Exhibits, #14 & 20). CMS has also

implemented other cost-saving/avoidance policies, such as their Chronic Care Clinic policy, which contravenes Delaware Law. (See Plaintiff's Exhibit #13). CMS sent a memo to DCC officials to post in the prison's newspaper that essentially excluded covering such chronic conditions as the plaintiff's degenerative joint disease, despite the fact that CMS physicians have always recognized the plaintiff's DJD condition as a serious chronic condition that requires constant medical care. According to CMS's illegal practice, the plaintiff would have to pay a monthly fee for all the medical appointments and drugs that are found in his medical records. Title 11 of Delaware Law, section 6536(b) clearly states that inmates are not to be charged for treatment of a chronic condition, following an initial appointment. However, every time CMS takes over as the HCP for DCC, they immediately enact their CCC policy that only recognizes seven to eight chronic conditions as oppose to every chronic condition recognized by the medical community.

Several other inmates have become victims to CMS cost-saving practices, such as Michael McClosky, Ed Thompson, and Uhuru Nasheed. (See Plaintiff's Exhibits #12, 15, & 16). CMS's cost-saving practices won't stop even when highly publicize cases like Anthony Pierce has shocked the general public. The same medical situation would take place with Donnie Weaver, prompting Weaver's attorney to write to the U.S. Department of Justice. See (Plaintiff's Exhibit #21). Weaver was so upset about CMS's neglect that he provided the plaintiff with a copy of his lawyer's letter. CMS corp. ultimately approved of the plaintiff's operation, but it was their tacit cost-saving practices that led Altman and Rundle to deny and postpone approving of the plaintiff operation until the plaintiff followed the example of Dave Williamson and file a civil suit, alleging among

other things, that CMS policies allowed the plaintiff to suffer needlessly for months while their physicians administered the only treatment that they were allowed – drugs, which they knew were ineffective. Williams v. State, 491 F.3d 710 (7th Cir. 2007). They pushed for an operation; the plaintiff's medical records aptly support that. However, CMS Corp. who has final and ultimate authority for medical procedures, continued to deny plaintiff's operation. CMS Corp. and its agents, Rundle and Altman chose to ignore plaintiff's suffering in order to save money. Unlike Ronnie Moore, whose name can be found on Medical Grievances as the investigator, Medical Grievances under Rundle and Altman watch are visibly missing, a clumsy attempt to remain anonymous, thereby avoiding culpability were obvious. See (Plaintiff's Exhibit #19; compare with Plaintiff's Exhibits #3 and #4).

It is true that a prisoner patient cannot direct the type of medical care he receives, but this presupposes the following:

a) That the care the plaintiff did receive prior to approval of operation was adequate for his particular serious medical need; or
b) That adequate care was not alternatively denied, delayed, or based on non-medical factors; or
c) That knowingly less efficacious or ineffective care was rendered; or
d) That CMS defendants and administrators did not otherwise fail to acknowledge their own physicians medical concerns and requests for consultation with specialist for approval of operation absent legitimate medical factors.

The plaintiff claims all of the above and the evidence presented specifically demonstrate the existence of same, and/or that a reasonable juror could draw the inference based on the evidence. Alternatively, items (a) thru (d) are genuine issues of material fact. The record is clear that CMS approved of the operation after § 1983 complaint along with TRO/PI Motion was filed, and before the second consultation

21

appointment with DuShuttle. The second appointment with DuShuttle was the lynchpin

of the defendants' case. CMS justified all their actions not to proceed with the operation

until DuShuttle, an orthopedic expert, recommended that procedure at the second

consultation appointment. Their premise falls apart when it was established that CMS

had already approved of the operation before the October 2007 appointment with

DuShuttle; and the evidence shows that their own physicians recognized the need for an

operation months before, when the pain-relief drugs were not only ineffective, but were

actually causing the plaintiff additional harm as far back as January 2007. These same

physicians would submit countless consultation requests for the plaintiff to be taken to

DuShuttle for the operation due to their inability to manage DJD conditions' pain, which

were ignored. Hathaway v. Coughlin, 37 F.3d 63 (2nd Cir. 1994); and Warren v. Fanning,

950 F.2d 1370, 1373 (8th Cir. 1991).

Thus, the record is clear that CMS was motivated strictly by the filing of the civil

suit against them, therefore they had to abandon their cost-saving/avoidance custom,

which was the moving force in denying serious medical need stated in Eighth

Amendment claim. Jackson v. FCMS, 380 F.Supp. 2d 387 (D.Del.2005); Moody v.

Kearney, 380 F.Supp. 2d 393 (D.Del.2005). There is ample evidence of CMS's

custom/policy, ample evidence of CMS's doggedly continuing a course of denials and

delays, and ample evidence of immense pain suffered by the plaintiff due to their actions

listed. A genuine issue leaps out to a reasonable juror, because CMS's continued course

of care has already proven to be ineffective and it did result in intense pain and suffering

along with contributing to additional medical problems. Lopez v. Smith, 203 F.3d 1122,

1132 (9th Cir.2000).

In conclusion, in the event the Court is not persuaded that sufficient evidence exists to support a genuine issue of material fact for a jury to consider, plaintiff avers that the Court should postpone its ruling on defendants' request under Rule 56(f), because it is premature. Plaintiff has yet to initiate discovery on the defendants and to seek information on party's witnesses for the purpose of deposition. See (Affidavit of Continuance, plaintiff's exhibit #17). Due to plaintiff's continued four month stay in the hospital and prison's infirmary following surgery, plaintiff was in no position nor equipped to conduct discovery on the defendants. Plaintiff's requests for "Appointment of Counsel" (D.I. #7 and #40); and "Stay of Proceeding" motions (D.I. #18 and #39), clearly explained the vulnerable state and position the plaintiff's surgery placed him in. Trask v. Franco, 446 F.3d 1036, 1042 (10th Cir. 2006); and Valez v. Awning Windows, Inc., 375 F.3d 35, 40 (1st Cir. 2004). This rule is normally construed generally and granted liberally. See Beattie v. Madison County Sch. Dist., 254 F.3d 595, 606 (5th Cir. 2001).

WHEREFORE, for the reasons stated above, the plaintiff requests that defendants' CMS, John Rundle and Scott Altman's motion for summary judgment be denied; or alternatively postponed until plaintiff can complete his discovery.

July 21, 2008
Date

Russell Steedley

## Certificate of Service

I, Russell Steedley, hereby certify that I have served a true and correct copy of the

attached: Plaintiff's Response to Defendants' Motion for Summary Judgment, upon the

following:

James E. Drnec, Esq.
711 King Street
Wilmington, Delaware 19801
Attorneys for Defendants
Correctional Medical Services, Inc.,
John Rundle and Scott Altman

Pursuant to 28 U.S.C. Section 1746, I declare and verify under penalty of perjury under
the laws of the United States of America that the foregoing is true and correct.

Date: ˉ˅ˌ˅ ⁄ ˅˙ˌ          , 2008

Russell Steedley
SBI#00249572, W-1 Unit
Delaware Correctional Center
1181 Paddock Rd.
Smyrna, DE. 19977



1M:

SBI# *e*

**DELAWARE CORRECTIONAL CENTER**
**1181 PADDOCK ROAD**
**SMYRNA, DELAWARE 19977**

Office of the Clerk
United States District Court
844 N. King Street Lockbox 18
Wilmington, Delaware
19801-3570

# PLAINTIFF'S
# EXHIBITS

## AFFIDAVIT OF RUSSELL STEEDLEY

1. I, Russell E. Steedley, am the affiant listed above and do depose and state the following facts in regard to Steedley v. CMS, et al., C.A. No.07-448.

2. Affiant is over eighteen years of age and is competent to make this declaration.

Verification of Exhibits

3. Affiant verifies under penalty of perjury that the exhibits offered in support of Steedley's Response to Defendants' Motion for Summary Judgment are authentic and/or true and correct copies of the following:
   a. Affiant's medical records, which were filed by defendants in their Summary Judgment Motion (D.I. _4,2_ , Exhibit A);
   b. Relevant Affidavits from witnesses that had direct dealing with medical defendants and/or personally witness specific events pertaining to this case.
   c. Relevant Medical Grievances and formal letters to the defendants, Commissioner of Delaware Correctional Prisons, Warden of D.C.C. and other outside agencies.
Verification of relevant facts of events that contradict defendants' submitted Affidavits and other testimony found in defendants' Summary Judgment.

4. That on September 12th, 2006, Dr. DuShuttle gave affiant a choice to receive surgery or try to live with pain by, to which the affiant expressed his desire to get the operation.

5. That at the same appointment, #4, affiant was told by DuShuttle that he was relatively young for an total hip replacement and that he would most likely outlive the replacement joint, which would require another operation some 10 to 15 years down the road.

6. That inmate Michael Moore was at the same appointment and witness what transpired that day.

7. In October, 2006, the affiant was told by Dr. Durst of CMS, that affiant hip joint may have necrosis in it. Therefore, Durst requested a second opinion from a Physical Therapist, stating that CMS usually requires a second opinion before approving of an operation.

8. In January of 2007, Dr. VanDusen, requested a consultation with DuShuttle again because the pain-relievers were ineffective and he feared that affiant hips may have necrosis as well.

Exhibit #1

9. In January of 2007, affiant wrote to CMS Administrator(s) requesting adequate care, inquired into Dr. Durst's submitted consultation recommendation for Physical Therapist, and request for operation, etc.

10. In February of 2007, Physical Therapist evaluated affiant's condition and concluded that physical therapy was inappropriate at this time because affiant's condition was terrible, which is why no follow-up appointment was made. The therapist provided affiant with a small pamphlet that contained a light exercise regime to help affiant try to maintain some muscle mass, but could do nothing to improve his mobility.

11. In March of 2007, affiant was seen by Nurse Practitioner Ihuoma of CMS, who reviewed his recent medical records and concluded that affiant's blood test revealed that his kidneys were being adversely affected by the years of prescribed pain medication and that they were no longer functioning at 100%.

12. In April of 2007, affiant spoke to an inmate named Dave Williamson, who recently received an ACL Knee operation from CMS. Williamson attributed CMS's cooperation in that matter to having to answer to his Civil Complaint and TPO/PI Motion. Williamson told affiant the only way to get around CMS's cost-saving practices was to file a Civil Suit compelling to answer your medical issues appropriately.

13. In May 2007, Dr. VanDusen filed a second consultation request, since the first (#8) was denied due "request of additional information" by CMS. VanDusen express extreme concern about affiant's blood test results regarding his kidney functions and necrosis in the right hip joint, which could lead to affiant losing his leg.

14. In June of 2007, affiant was seen by NP Ihuoma, who again expressed her concerns about affiant's kidneys function. Ihuoma checked on VanDusen request for consultation, but was told that CMS required additional information, which perplexed her. When affiant asked who is responsible for the decision for affiant to receive an operation, Ihuoma replied that it was "CMS's administrators." When I ask who they were, she would not provide that information.

15. In late June of 2007, affiant met with CMS staff regarding his Medical Grievance that was initially denied in April 2007. The Chairperson to this meeting was Nurse Gail Eller, who informed the affiant that his request for an operation still required addition information in order to meet their criteria. When affiant asked, who sets the criteria, Eller responded that CMS's administrators do, but she would not provide their names.

16. On the same day of #15, affiant ran into VanDusen on the main compound and informed the doctor of the events and decision at the Medical Grievance, to which VanDusen expressed his puzzlement. He stated that he had provided CMS administrators with more than enough information to confirm an operation.

17. In July 2007, affiant follows inmate Williamson advice in submits a Civil Suit 1983, and TRO/PI Motion with the intend to compel CMS to follow to recommendations of Dr.

DuShuttle's because the pain was unbearable and had been for years despite the pain relief treatment offered.

18. On September 26, 2007, affiant was called to a Medical Grievance hearing at Level II regarding his original Grievance filed in April 2007, where Chairperson Eller informed him that the operation for affiant's right hip had been approved by CMS administrators and that he could expect to be taken out for that procedure within a couple of months, no later. However, for security reasons CMS could not give him the exact date.

19. On October 2, 2007, affiant was taken to Dr. DuShuttle's office and again told by the doctor that his operation was approved.

20. On January 21, 2008, four months after operation was officially approved, affiant was taken to Milford Memorial Hospital, where Dr. DuShuttle performed a total hip replacement operation on affiant's right hip.

21. Immediately following the surgery, DuShuttle met with affiant and informed him that his hip was one of the worse he had ever seen and that he was not out of the woods yet. DuShuttle also added that, "the joint had jumped out of its socket and started forming its own. That had to be extremely painful for you."

22. Since receiving the operation, affiant's blood pressure had returned to normal levels and he's experience no pain at all in the right hip. However, the left hip, which was also diagnose as having osteoarthritis, just not as bad as the right, is starting to give affiant some problems and will eventually have to be operated on in due time.

23. Affiant submits that CMS's cost-saving practices have forced him to endure numerous years of insufferable pain, while treating him with pain relief therapy that their physicians acknowledge as being a **failed** treatment. When given an option by Dr. DuShuttle in September 2006, to fix affiant's condition with an operation, CMS opted for a cheaper care/treatment that their own physician documented as being utterly useless. CMS continued denying the affiant's need for an operation even after they knew the pain relief treatment was causing the affiant addition medical problems (Kidneys and necrosis).

24. Prior to CMS's confirmation of affiant's operation, affiant request for an operation were denied by CMS and other health care providers, who relied on non-legitimate medical reasons, "you are too young for an operation."

Pursuant to 28 U.S.C. Section 1746, I declare and verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___July 15___ , 2008

Russell E. Steedley

## AFFIDAVIT

I <u>Micheal D. Moore, #00276179</u>, being duly sworn, deposes and says:

I am writing this affidavit on the behalf of Russell Steedley. Russell Steedley and I were taken to see Dr. DuShuttle for evaluation on September 12, 2006. During the evaluation, Dr. DuShuttle told Russell that he definitely needed a complete hip replacement.

The doctor asked Russell how much time he had on his sentence and after Russell told him that he had a lengthy sentence, the doctor told Russell, "You are awfully young to have a hip replacement, and you probably will need the procedure done a second time at a later date." He told Russell that the only way to solve his problem was to have a complete hip replacement.

I, Micheal D. Moore, affirm that these statements are true and I was present when the diagnosis was made.

SUBSCRIBED AND SWORN before me this _8th_ day of _May_, 200_7_

Notary

my Commission expires: June 14, 2008

Exhibit #2

DCC Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 06/04/2007

## GRIEVANCE REPORT

### OFFENDER GRIEVANCE INFORMATION

| | | | |
|---|---|---|---|
| **Offender Name :** STEEDLEY, RUSSELL E | **SBI#** : 00249572 | **Institution** : DCC | |
| **Grievance #** : 117326 | **Grievance Date** : 05/30/2007 | **Category** : Individual | |
| **Status** : Unresolved | **Resolution Status :** | **Resol. Date** : | |
| **Grievance Type:** Health Issue (Medical) | **Incident Date** : 05/29/2007 | **Incident Time :** | |
| **IGC** : McCreanor, Michael | **Housing Location :** Bldg W1, Tier H, Cell 13, Single | | |

### OFFENDER GRIEVANCE DETAILS

**Description of Complaint:** Health Care Provider (CMS) ran out of Vicodine medication over the entire Memorial Day week end. I was given an alternative pain reliever for excruciating DJD condition.

**Remedy Requested** : Total hip replacement as recommended by Dr. DuShuttle and other medical experts.

### INDIVIDUALS INVOLVED

| Type | SBI # | Name |
|---|---|---|
| | | |

### ADDITIONAL GRIEVANCE INFORMATION

**Medical Grievance :** YES                    Date Received by Medical Unit : 06/02/2007

**Investigation Sent :** 06/02/2007            **Investigation Sent To** :

**Grievance Amount :**

Exhibit #3

DCC Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 01/19/2007

## GRIEVANCE REPORT

### OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| Offender Name : STEEDLEY, RUSSELL E | SBI# : 00249572 | Institution : DCC |
| Grievance # : 92967 | Grievance Date : 12/29/2006 | Category : Individual |
| Status : Resolved | Resolution Status : Level 1 | Resol. Date : 01/19/2007 |
| Grievance Type: Health Issue (Medical) | Incident Date : 12/29/2006 | Incident Time : |
| IGC : Merson, Lise M | Housing Location : Bldg W1, Tier A, Cell 12, Single | |

### OFFENDER GRIEVANCE DETAILS

**Description of Complaint:** Inmate claims: On or about 9/06 Dr. Dushuttle an orthopedic specialist examined my chronic right hip condition and recommends a full hip replacement. following the exam, both ECM physician put me in for physical therapy, which was approved by the ECM administration. to date, I have not been taken out for physical treatment nor any indication that an operation is forthcoming. Meanwhile, my chronic hip condition continues to deteriorate. I have been treated with medications for nearly ten years for this same condition.

**Remedy Requested** : Move for surgery and/or physical therapy.

### INDIVIDUALS INVOLVED

| Type | SBI # | Name |
|---|---|---|
| | | |

### ADDITIONAL GRIEVANCE INFORMATION

**Medical Grievance :** YES          Date Received by Medical Unit : 01/16/2007

**Investigation Sent :** 01/16/2007          **Investigation Sent To** :

**Grievance Amount :**

Exhibit #4

TO:       FCM Administration staff

FROM:     Russell Steedley, SBI#00249572, W-1 Unit

DATE:     January 10, 2007

RE:       Status of Chronic Care Treatment


To Whom It May Concern:

For the passed ten years I have been suffering from osteoarthritis or degenerative joint disease (djd) and have been treated with a sundry of meds, the most recent Indicin, which I've been on for years. Most physicians agreed that although Indicin is the appropriate medication regime to be on, that one should not stay on any particular anti-inflammatory or pain-reliever too long.

In September 2006, I was taken to the offices of Dr. DuShuttle for evaluation of my right hip. The doctor concluded that, despite my relative age, the only option left for my condition was total hip replacement surgery. Subsequently, the physician for FCM / m put me in to receive physical therapy, which he later established was approved by your office.

To date, I have not been taken out to be seen by any therapist while my degenerative joint disease condition has continues to deteriorate to the point where putting on my socks and shoes has become a laborious ordeal. Despite taking two forms of medication to combat the pain and lack of mobility, I'm barely able to function or walk.

I wish to know if the physical therapy option is still being pursued and if that option can be bypassed and moved directly to the operation that Dr. DuShuttle recommended.

Very truly,

Russell Steedley, inmate


cc:       Keesha West
          file

Exhibit #5

## Medical Grievance Appeal Form

This must be completed and returned to the IGC by the due date. If not received by the due date your appeal will not be processed. This form is to be returned via the Grievance Box If you do not wish to appeal you must return this form with the notation that you do not wish to appeal. DO NOT send this form to Medical Department. Please specify the reason for the appeal in the space below.

Grievant: Russell Stechley    SBI#: 00247572

Housing Unit: W-1    Case#: 106965

Date: 6/26/07    Due Date: 7/2/07

I am appealing the Level 2 Appeal Process decision that states that: "CMS Administrators are postponing any decision regarding the operation on my hip while awaiting further information from Dr. Van Dusin," because any further delay in moving forward with the surgery to repair my right hip only exacerbates my condition and suffering while inexorably leads to irreversible damage to both my kidneys and right leg. I am currently being treated with Indocin and Vicodine for my Osteoarthritis condition, which is a chronic condition, and yet, according to CMS's new policy. I'm required to pay for all medical appointments and treatment. This policy is in direct violation of Delaware Law 11 Section 6536 (b) and (c). In addition, Nurse Practitioner Ihuna stated that my kidney problems are a byproduct of long-term use of the pain-relievers and anti-inflammatory drugs that CMS and all other contracted health care providers have prescribed as treatment for my chronic hip problem.

Submitted 6/26/07
1430 hrs

_____
INMATE SIGNATURE

Exhibit #6    itional space, attach 8.5" X 11" size sheets of paper.

# Medical Grievance Appeal Form

This must be completed and returned to the IGC by the due date. If not received by the due date your appeal will not be processed. This form is to be returned via the Grievance Box **If you do not wish to appeal you must return this form with the notation that you do not wish to appeal.** DO NOT send this form to Medical Department. Please specify the reason for the appeal in the space below.

Grievant: Russell Steekley                SBI#: 00249572

Housing Unit: W-1                Case#: 117326

Date: 9-26-07                Due Date: 10-3-07

On the above date and at 0650 hrs, I was informed by the MG committee that the operation to repair my damaged right hip has been approved and that I should be taken out for that procedure within the next two months or relatively sooner. I decline signing off on this MG until the actual procedure has been performed. Therefore, this second Appeal will only become ~~relative~~ relevant and factual if said medical procedure is not carried out within the time promised by MG chairperson Gail Eller.

INMATE SIGNATURE

If you need additional space, attach 8.5" X 11" size sheets of paper.

Exhibit #7

## AFFIDAVIT OF DAVID WILLIAMSON

1. I, David Williamson, am the Affiant listed above and do depose and state the following in support of <u>Williamson v. Correctional Medical Services, Inc., et al,</u> 06-379-SLR:

2. On 03-14-07, Affiant received reconstructive knee surgery to replace a ruptured Anterior Cruciate Ligament (ACL).

3. DuShuttle, MD was the outside orthopedic specialist who performed the procedure.

4. DuShuttle had read the MRI results and performed a specialized knee exam in June 2006 (circa).

5. DuShuttle informed Affiant of the following:

   (a) Affiant had a permanent injury that would not heal on its own;
   (b) That it caused further deterioration of the knee joint and or arthritis; and
   (c) That the inherent instability of the knee joint was a significant hazard of creating falling or collapsing incidents.

6. DuShuttle recommended the following:

   (a) Reconstructive surgery;
   (b) Special ACL "Don-Joy" knee brace; and
   (c) Post-op physical therapy.

7. DuShuttle, however, candidly opined that the needed surgery would likely fail because he believed that CMS would refuse to provide the Don-Joy brace and would refuse to provide the –critical- physical therapy.

8. In fact, DuShuttle stated flatly that the brace ran about one-thousand dollars, which is why CMS would refuse to provide it.

9. For nine months after DuShuttle made his informed and professional medical judgment/recommendation, CMS refused to provide the Don-Joy brace ostensibly due to a phantom security concern.

10. Affiant filed a TRO/PI demanding the needed care and when he challenged CMS's pretext they conceded and provided the Don-Joy brace.

11. Affiant had already experienced the following due to his permanent knee injury:

    a) Acute pain and suffering;
    b) Significant impairment of his normal daily functions (e.g. inability to promote good health via meaningful exercise);
    c) Significant instability of the knee joint, in which the knee would abruptly buckle out sideways or backwards at an unnatural angle; and
    d) The above would conspire to result in a significant risk of likely future permanent injury.

12. Though, DuShuttle made the recommendations listed above, CMS refused to provide any care whatsoever for some nine months, and Affiant was forced to seek redress in the U.S. District Court for the District of Delaware in order to force CMS to provide the necessary care.

13. CMS's actions, to deny needed care and or create an inordinate delay, were not rooted in any legitimate medical factors, or in any exercise of professional medical judgment. They were actually based in CMS's custom/policy of cost-avoidance.

14. The above is true and correct, and it is based on Affiant's personal observations and experiences.

Sworn and subscribed before me this 25, April 2007.

_Daveh_

David Williamson, SBI # 183022

Notary Public

Exhibit #8

AFFIDAVIT OF FRANK L. ROSS

1. I, Frank L. Ross, am the affiant listed above and am an inmate at Delaware Correctional Center in Smyrna, Delaware and that I have been incarcerated at this institution since May 1, 1980.

2. I am making this affidavit at the request of Russell E. Steedley, who is also an inmate at Delaware Correctional Center.

3. That the affiant make this affidavit free of coercion or duress or promise of reward.

4. That the affiant has known Russell Steedley for over fourteen years and became familiar with Steedley's hip problem while both men were housed in the same unit, in 1997.

5. In 1997, affiant and Steedley formed a bond as work-out partners, who regularly exercised together to stay fit, until May 2002.

6. During the tenure listed in item #5, the affidnt witnessed the gradual break down of Steedley's ability to do workouts with his legs, such as jogging or weightlifting.

7. The affiant also observed that Steedley began to walk with a discernible limp, where his upper body would sway with a side to side movement, (i.e. like a Penguin).  This wobbling motion started around late 1999, or early 2000.

8. The affiant recalls Steedley often complaining about the constant pain in his hip, despite the drugs prescribed by the Health providers to stem the pain.

9. From May 2002, to July 2004, the affiant and Steedley were housed in different units, however, we met frequently, in particular at the Saturday Catholic Services.  During this period the affiant noticed that Steedley's limp had become more pronounced, to the point that it was painful to watch Steedley to try to walk.  Steedley's wobble often engendered scorn and mean spirited comments from staff and inmates.

10. In 2003, it becomes apparent to everyone that Steedley's medical condition needs serious medical help, but accordning to Steedley, all of his requests to have an operation, or to have his hip examined by a specialist are denied.

11. In 2005, Steedley is given a cane to aid his walking ability. Steedley informs the affiant that his request for an operation continue to be denied by the health care provider solely due to his "young" age.

12. In September 2006, Steedley tells affiant that he was finally approved to have his hip examined by a Specialist.

13. Steedley reports that he was seen by Dr. Du Shuttle, an orthopedic specialist, and the doctor approved of the operation to repair his hip despite Steedley's relatively "young" age.

Exhibit #9

14. In March 2007, Steedley is noticably upset due to the pain from his hip problems and because CMS officals continue to refuse giving him the recommended operation.

15. In April 2007, the affiant, Steedley, and another inmate, named David Williamson (who recently received an ACL operation on his knee, despite being four years younger than Steedley), discuss what Williamson did in order to get his corrective procedure done.

16. Williamson told Steedley that they would continue to delay and postpone giving him the operation -like they did to Williamson- until he filed a law suit and TRO/PI motion against C.M.S.

17. During the Spring and Summer of 2007, the affiant notices that Steedley is barely able to get around, even with the aid of a cane.

18. In October, 2007, Steedley, informs affiant of CMS's decision that finally approves of the operation that Dr. Du Shuttle recommended in 2006.

19. In late January 2008, the affiant visits Steedley at prison's infirmary following his January 21, 2008 operation on Steedley's hip. Steedley appears effervescent for his first time in many years, and claims to be pain-free as well.

20. The affiant belives that Steedley suffered needless for too long and that he would still be suffering at the hands of CMS, if he had not followed inmates David Williamson's advice and example.

21. The above is true and correct, and it is based on affiant's personal observations and experiences.

Sworn and subscribed before me this _26th_, _January_, 2008.

_Frank J. Ross_
Frank L. Ross SBI#00168644

_Timothy J. Martin_
Notary Public

Commission expires: June 19, 2008

### AFFIDAVIT OF RUSSELL E. STEEDLEY

1. I, Russell E. Steedley, am the Affiant listed above and do depose and state the following facts regarding my medical treatment.

2. The Affiant was born on August 4th, 1959, in New York City.

3. The Affiant is currently incarcerated at D.C.C., in Smyrna Delaware and that he has been so since June 10th, 1990.

4. On June 10th, 1990, just prior to Affiant's arrest, he sustained a serious injury to his right leg while leaping down a staircase.

5. On June 10th, 1990, Affiant was taken to KGH where X-Rays were taken only on his right knee and left ankle, which revealed a broken right Tibia.

6. On June 12th or 13th, 1990, Affiant was taken to KGH, where Doctor DuShuttle performed an operation to fix right tibia, implanting two screws just below his right knee.

7. In the summer of 1997, Affiant began to experience pain in his right hip joint and initial signs of mobility problems. A medical appointment was set up and he was given Motrin.

8. In the summer of 1998, Affiant right hip pain increases and mobility begins to decrease where he begins to walk with a limp.

9. In the summer of 1998, at a medical appointment with Dr. Miller, Affiant is told that he has Degenerative Joint Disease (DJD) or Osteoarthritis in his right hip and it's a chronic disease.

10. At same appointment #9, Dr. Miller informed Affiant of the following:
    (a) Affiant had a permanent injury/condition that would not heal on its own;
    (b) That it will continue to deteriorate and cause great discomfort;
    (c) That Affiant mobility will diminish greatly;
    (d) Treating Affiant condition with pain-relievers is always the initial step;
    (e) And that it may come a time when conventional pain-relief treatment won't be enough to help the Affiant.

11. At same appointment #9, Affiant is prescribed Indocin for treatment.

12. In the spring of 1999, Dr. Miller tells Affiant that his case is being referred to PHS head physician, Dr Ivens, for discussing operation on right knee and hip. That referral meeting is never completed.

13. On November 13, 2000, Affiant writes to the Warden Tom Carroll of D.C.C., concerning "Co-pay issue" and "discontinuation of meds" and potentiality of medical toxicity from meds, as expressed by Dr. Cancino, the treating physician for CMS.

14. Between the years 1999 and 2003, Affiant Chronic Care status is constantly changed by CMS and FCM, the contracted health care providers, forcing Affiant to eventually involve the Lt. Governor's Office. During this time period Affiant treatment for "DJD" becomes erratic and he often goes days and some times weeks without pain relief.

Exhibit #10

15. On November 25, 2003 Affiant writes to FCM expressing concerns of medical toxicity and need for alternative treatment three years after Dr. Cancino expressed concerns.

16. In the winter of 2004, Affiant DJD conditions has deteriorated to the point where:
    (a) Can no longer lift right leg up to a 45 degree angle;
    (b) Unable to run at any speed or stand in one place for long periods of time;
    (c) Ambulating with a pronounced limp that wobbles from side to side, which resembles a Penguin's walk;
    (d) Affiant is constantly joked about and receives scornful ridicule from staff and other inmates, which negatively impacts affiant's emotional and mental state;
    (e) Struggles noticeably to put on socks and shoes;
    (f) Experiencing acute pain and suffering, even with pain-relief treatment;
    (g) And this significant impairment impact on affiant's life has drastically curtailed his normal daily functions, (e.g. inability to promote good health via meaningful exercise).

17. In the winter of 2005, Affiant is assigned a walking cane by health care providers. Affiant requests for an hip operation are continually shot down by treating physicians, each of whom all claim that he is either too young for an operation or that the present contracted health care won't pay for that type of operation.

18. On September 12th, 2006, Affiant was examined by Dr. DuShuttle an Orthopedic Specialist, and he recommended total hip replacement for right hip.
    (a) Dr. DuShuttle states that it isn't often that a person whose the age of the Affiant receives a total hip replacement;
    (b) Dr. DuShuttle added, however Affiant condition was not produced naturally, but rather by an accident;
    (c) that the Affiant hip condition is so bad that there's no other option but to get the operation;
    (d) And that the choice was up to the Affiant to get the operation or try to live with the pain.

19. In October 2006, Affiant was seen by Dr. Durst for CMS, who concurred with Dr. DuShuttle's recommendations, after viewing Affiant's X-Rays. He filed report to CMS administrators requesting an operation.

20. At same appointment #19, Dr. Durst expressed great concern that Affiant condition may deteriorate into necrosis since original cause of DJD was due to significant impact that occurred 16 years ago, as oppose to a natural aging progression.

21. At same appointment #19, Affiant complains that conditions found in #16 (a to g) have exasperated and that the pain in right hip has grown increasingly unbearable. Dr. Durst prescribes stronger painkillers (a mild narcotic), name unknown.

22. In December 2006, Dr. Van Dusin of CMS, expresses belief that Affiant condition requires surgery, but first recommends Affiant be seen by physical therapist for a second opinion. Doctor's places Affiant on Vicodine (a narcotic) after experiencing an adverse reaction to previously prescribed meds for pain relief. The relief is minimum.

23. In January 2007, Affiant files Medical Grievance regarding physical therapist referral not being kept.

24. In January 2007, Affiant's Grievance is heard by CMS Nurse Debbie Rodweller and both agree to drop the issue providing that affiant is taken to a Physical Therapist within a couple of weeks.

25. In February 2007, Affiant is taken to Physical Therapist at (KGH) Jonnice Steward.

26. At same appointment # 25, PT Steward recommends surgery as well, stating that physical therapy more suited after the operation since Affiant condition and mobility is so bad. PT recommends mild exercise regiment to help improve muscle structure around Affiant's hip and knee, which has withered away due to restricted mobility and stability in right leg.

27. In March 2007, Affiant is seen by Nurse Practitioner Ihmua of CMS, who reviews medical record:
    (a) NP Ihmua places another referral with an Orthopedic;
    (b) Affiant is told, according to last blood test that his Kidneys are not function at 100%;
    (c) NP Ihuma orders a battery of tests, including blood and urine test;
    (d) And NP Ihuma that CMS will no longer treat the Affiant's severe pain produced by my DJD condition with Vicodine.

28. On March. 19th, 2007, Affiant sent a second letter to Nurse Rodweller inquiring about his hip replacement operation since he isn't being treated for the pain from his chronic condition.

26. In March or early April 2007, Affiant has blood and urine taken for test by CMS.

27. On April 10th, 2007, Affiant files another Medical Grievance regarding hip replacement operation.

28. On April 19th, 2007, Affiant has Grievance hearing with Unknown Nurse for CMS, who denies affiant's request that CMS acknowledge and comply with Dr. DuShuttle an Orthopedic; CMS physicians Dr. Durst and, Dr. Van Dusan; and Physical Therapist Jonnice Steward recommendations:
    a. Nurse states that although Affiant DJD condition is very bad, he is too young to receive a hip replacement;
    b. Nurse states that the orthopedic and physical therapist agree that his condition is bad, but he would probably need another hip operation after some 10 or so years go by to replace the worn down artificial joint;
    c. And Affiant's Medical Grievance has been appealed to next level of the proceedings, to be heard by the Director of Nurse (CMS) and Captain McCraner (D.C.C. representative).

29. In April 2007, Affiant interviewed inmate Dave Williamson, W-1 unit, recently had his knee replaced and he is younger than Affiant by some 7 years. (See: Williamson's Affidavit)

30. On May 5th, 2007, Affiant had an EKG performed.

31. On May 7th, 2007, Affiant was seen by Dr. Van Dusan for Chronic Care Medical Appointment:
    a. Dr. Van Dusan reports that Blood Pressure and Cholesterol levels are back to normal (120/78);
    b. Negative blood test of HIV and Hepatitis;
    c. EKG looks good;
    d. Doctor placed a formal notice recommending the operation (Total hip replacement);
    e. Doctor stated that Affiant condition has deteriorated significantly and that necrosis may be the problem in the near future if operation is put off;
    f. And Doctor told Affiant to expect to be either seen by a specialist soon;
    g. Or that since Affiant has already been tested and prepped for the operation, there's no need to do it again providing CMS acts hastily;

     h.  And Doctor placed Affiant back on Vicodine again at double the dosage originally received in the past.

32. CMS's denial of Affiant Grievance (See #28), and continuous putting off of a medical procedure that Affiant clearly needs are not rooted in any legitimate medical factors, or in any exercise of professional medical judgment. They systemically continue to deny Affiant of the necessary care/procedure required in accordance with U.S. Constitutional 8th Amendment Rights as outlined in Estelle v. Gamble, 429 U.S. 97, 103 97 S.Ct. 280. Their action is based on CMS's custom/policy of cost-avoidance.

33. The above is true and correct, and it is based on Affiant's personal observations and experiences.

Sworn and subscribed before me this 23, May 2007.

_____                    _____
Russell Steedley, SBI#249572                Notary Public

AFFIDAVIT OF AMIN FAZIL AL-AMIN (AKA JOHN HOWARD)

1. I, Amin Fazil Al-Amin (aka John O. Howard), the affiant listed above, am an inmate at the Delaware Correctional Center, in Smyrna. Delaware.

2. Affiant is over eighteen years of age and is competent to make this declaration.

3. Affiant makes this declaration/affidavit free of coercion or duress or promise of reward.

4. Affiant makes this declaration at the request of Russell E. Steedley, who is also an inmate at D.C.C.

5. In 1988, affiant received a microscopic examination of his left knee, which revealed that the knee had torn ligaments. The process was done by unknown physician and while affiant was incarcerated at D.C.C.

6. Despite this medical diagnose, the affiant would receive only pain-relief medication for his injury, which would only grow progressively worse.

7. In 2006, affiant submitted a complaint to the health care provider, Correctional Medical Service, (CMS) concerning increasingly painful condition in his knee, which had swollen.

8. On November 6, 2006, affiant was taken to the Christiana Care Unit where his knee was examined by an orthopedic surgeon.

9. On December 15, 2006, affiant was taken to the MDI Center in Dover, Delaware, to have an MRI performed on his knee.

10. On December 27, 2006, affiant submitted a follow-up Sickcall Slip to CMS to find out the results of that MRI.

11. On January 19, 2007, affiant was seen by Dr. VanDusen, regarding the results of the MRI performed Dec. 15, 2006. The results revealed that all the ligaments in the affiant's left knee were torn and that the cartilage was damaged to the point of bone-to-bone contact, which is extremely painful, despite the pain-relief treatment/drugs prescribed by CMS's doctors.

12. At that same appointment, #11, Dr. VanDusen submitted a consultation request form for the affiant to be seen by an orthopedic surgeon for the purpose of determining the proper surgical procedure to fix affiant's knee.

Exhibit #11

13. On April 2, 2007, three months later, the affiant was sent to an orthopedic surgeon as requested by VanDusen. At this time the affiant's condition started to affect his lower back and hip area. A Sick call was submitted for these problems.

14. On April 19, 2007, affiant was seen for Sick call appointment #13, where he was experiencing significant pain. He was seen by NP Ihuoma Chuks, who informed the affiant that VanDusen consultation request was denied by CMS administrator(s) because as an old injury, it did not meet CMS's criteria standard. NP Ihuoma stated that she would resubmit VanDusen's request for consultation.

15. In later April 2007, affiant was told by another inmate named Dave Williamson, who had recently received an ACL knee operation that the only way he would get his knee properly taken care of was to file a Civil Suit and TRO/PI, as Williamson had done.

16. On May 17, 2007, affiant filed a Medical Grievance regarding CMS's denials to have his knee examine by an orthopedic surgeon to determine the need for surgery, stating that CMS's administrators were applying cost-saving customs and practices by treating him with cheaper drugs as opposed to moving for and approving of an operation to fix affiant's condition.

17. On June 7, 2007, affiant was taken to Christiana Care Unit in Dover, Delaware, where Dr. DuShuttle examined him and informed affiant he would be ready to perform surgery on the affiant's knee in approximately four weeks.

18. However, that operation date would come and go, while the affiant suffered daily from the pain in his knee, hip, and lower back.

19. On September 6, 2007, affiant was taken to Avenue Medical Center in Dover, Delaware, to be fitted for an Orthopedic knee brace, a cheaper treatment than surgery.

20. On September 26, 2007, affiant had a Medical Grievance hearing regarding May 17, 2007, Grievance, however, he wasn't able to make that appointment because Sgt. Johnson, of D.C.C. (12 to 8 Shift) told him that that hearing was to be re-scheduled.

21. On September 26, 2007, Affiant received an orthopedic brace.

22. On October 1, 2007, affiant was taken to Milford Hospital where DuShuttle performed ortho-scopic surgery on his knee. But not a knee replacement, which is what affiant needed as indicated by DuShuttle in #23.

23. On November 7, 2007, affiant was taken again to Christiana Care Unit in Dover, Delaware, for follow-up to October 1, 2007 surgery. During that visit, Dr. DuShuttle informed affiant that there was nothing more he could do with his knee

because there was too much arthritis damage already done and that the medical procedure he performed on affiant's knee will only last for two year. DuShuttle stated that affiant needs a knee replacement and he forwarded that information to CMS.

24. As a result of CMS's cost-saving polices and practices, through denials and delays, affiant has been force to endure extreme pain in his knee, hips, and lower back, when an orthopedic experts agrees that affiant requires a total knee replacement, CMS's continues to treat affiant's condition with ineffective drugs and a knee brace ~~that~~. The affiant situation mirrors Williamson, who only received an operation after filing a Civil Suit compelling CMS to give him that operation. This practice by CMS staff and administrators constitutes deliberate indifference to affiant's serious medical needs.

Pursuant to 28 U.S.C. Section 1746, I declare and verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June __\7\__, 2008

_Amin F. Al-Amin_
Amin F. Al-Amin

AFFIDAVIT OF MICHAEL T. MCCLOSKEY

| | | |
|---|---|---|
| STATE OF DELAWARE | } | |
| | | SS |
| COUNTY OF NEW CASTLE | } | |
| | } | |

I, Michael McCloskey, being first duly sworn, depose and says: am the affiant listed and do depose and state the following facts regarding my medical treatment.

1. The Affiant was born on April30, 1954, in Wilmington, Delaware, 19801.

2. The Affiant is currently incarcerated at the Delaware Correctional Center in Smyrna, Delaware and that he has been so since March 1, 1981.

3. Affiant began noticing a lump at the base of his little finger on his right hand, toward the end of 1987. During a medical visit, affiant was told by Dr. Applebaum, a CMS surgeon, that the lump was a condition called Dupuytren's Contracture and that they, CMS, would keep an eye on it, and that nothing could be done until it got to the point where his fingers were constricted to a point where he could not use them.

4. The lump slowly grew over the years and affiant asked to have it checked periodically throughout the 1990s. Each year he had a physical and would ask the doctor who examined him if anything could be done about the growing lump

5. Beginning in 2001, affiant little and ring fingers began to become constricted. (pulled inward toward the palm), to a point where he requested medical attention. It was not until an exam on May 26, 2004 when Dr. Ali acknowledged that the growth was now at a point that warranted attention. Dr. Ali told affiant that he needed reconstructive surgery and said she would submit a consult to have him examined by a surgeon.

6. After waiting over a year, with no action being taken, affiant submitted a grievance (#16309) on August 07, 2005, regarding medical attention for his hand. During the period between May, 2004 and August, 2005 affiant waited patiently for some sort of medical action regarding his medical condition. During this same period, FCM was replaced by CMS as the health care provider at D.C.C.

7. On August 08, 2005 affiant was seen again by Dr. Ali, for a physical. He requested action to be taken with the constriction on his hand again and reminded Dr. Ali that she told him the previous year that a consult was submitted for that problem. After reviewing his medical file, Dr. Ali agreed that she did indeed examine affiant in May of 2004 and submitted a consult referral for him to be seen by a surgeon. Affiant witnessed the doctor's submitting of a second consult while he waited in the examination room.

8. On February 14, 2006, affiant was seen in medical by RN Debbie Rodweller, (CMS), regarding a grievance submitted relating to his eye glasses. At that hearing, he also asked about the state of the grievance for his hand. RN Rodweller told affiant that she could not find any record of it. However, she did schedule him to see a doctor the next day.

Page 1 of 4

Exhibit #12

9. On February 15, 2006, affiant was seen by Dr. Burns, (CMS), and she reviewed his medical file and told affiant that she could not find any record of previous consults for him to be seen by a surgeon regarding his hand.

10. At the same appoint (#9), Dr. Burns examined both of the affiant hands and told affiant that the constriction on his right hand did warrant attention. She wrote a consult for affiant to be seen by an orthopedic surgeon and said she would check back with him in a month.

11. On March 16, 2006, affiant was seen by Dr. Burns again, where she informed him that the consult request was approved.

12. On March 28, 2006 affiant was taken to Dr. DuShuttle's office for an examination of his hand. Dr. DuShuttle examined his hand and told him that he had Dupuytren's Contracture and that he, (Dr. DuShuttle), would recommend surgery to correct the constriction.

13. Affiant waited two months and was again taken to Dr. DuShuttle's office on May 9, 2006. Dr. DuShuttle was surprised to see affiant and stated that he already recommended surgery and therefore did not know the reason for the second visit to his office. He also stated the he would reaffirm his previous diagnosis and recommendation to CMS.

14. On May 23, 2006, Affiant attended a Level 2 grievance hearing regarding his hand. He was told, by the grievance committee chairperson, that the surgery was approved and that CMS had sent him to the doctor to have the surgery. One nurse added, "it is your fault the surgery was not done. We sent you out on May 9, to have it done." Affiant was asked to sign off on the grievance because the surgery was approved. Affiant declined to sign-off on the grievance since the surgery was not yet actually done and he was told repeatedly in the past that action would be taken on his hand.

15. On June 21, 2006, affiant finally received the surgery on his hand at Kent General Hospital. He had a follow-up visit at Dr. DuShuttle's office on June 30, 2006. At this visit he was told to begin bending his fingers five times a day. No other instructions were given at this time regarding care of his hand.

16. Affiant was seen by Nurse Practitioner Ihoma on July 10,2006 and had the sutures removed. At this time he asked if there was anything specific that he needed to do for care regarding his right hand. NP Ihoma told him to keep the hand dry; keep wearing the brace; and submit a sick call if he experienced any swelling or oozing regarding his hand.

17. On July 13, 2006, Affiant began experiencing pain at night in his hand and submitted a sick call, as instructed by NP Ihoma, on July 21, 2006.

18. On July 24, 2006, affiant again was taken to be seen by Dr. DuShuttle for a follow-up appointment. However, he was actually seen by an associate of Dr. DuShuttle. Affiant was told that he had to bend his fingers despite the pain; less scar tissue grows. Affiant was also told that his hand was healing nicely and he would prescribe something for the pain. The associate removed the splint and told affiant that he no longer needed it.

19. After a weekend of extreme pain and no pain relief medication, affiant submitted a sick call slip. He was eventually seen by NP Ihoma. She reviewed his file and informed affiant that Dr. DuShuttle had recommended Naproxen for his pain. NP Ihoma told affiant to expect to get the prescription soon, by the following Monday, July 31.

20. On July 31, 2006, affiant went to the med window and was told the prescribed pain reliever was not in yet. Affiant continued to check the medication pick-up list and medical appointments list daily to see if his name showed up for the treatment. Meanwhile, he continued to experience pain and swelling in right hand continued. Affiant did not get any response until he approached his unit's Sergeant on the 5th of August and asked if he would call medical for him. By this point, affiant was hardly able to get any sleep due to the intense pain in his right hand. The next day he was finally able to get the prescription of Naproxen 500 mg.

21. On August 10, 2006, affiant was seen by Debbie Rodweller, the CMS Grievance Representative, regarding a grievance he submitted regarding a delay in receiving pain medication.

22. During this meeting (#21), affiant explained to RN Rodweller that he was still having a lot of pain and swelling in his hand. He also returned a splint NP Ihoma had given him the previous week. The splint was made for a left hand and did not help affiant in any way. Affiant further showed her his left hand and little finger, which was bent at an angle and could not be straightened. NP Ihoma scheduled him to see a physician.

23. On August 15, 2006, affiant was seen by Dr. Durst, (CMS). Dr. Durst told affiant the little finger was not normal and wrote a consult for Physical Therapy. In response to affiant's question regarding what affiant could do to help his hand, Dr. Durst stated, "you can not do anything correct your fingers. A physical therapist could work on your hand and do what you cannot do." Dr. Durst told affiant that it was not too late to fix the finger and to continue to use hot compresses. Affiant waited one month and on September 6, 2006, he sent a letter to Debbie Rodweller regarding rehabilitation of his hand.

24. When affiant did not receive a response, he wrote a letter to Deputy Warden Pierce, on September 16, 2006, asking for his assistance in receiving medical attention.

25. On October 7, 2006, affiant received a note from Debbie Rodweller saying, "a consult is in progress."

26. Subsequently, Deputy Warden Pierce forwarded affiant's letter to the Director of Nursing for CMS, Nurse Eller for review and action.

27. After waiting another month, affiant was called to see Dr. Van Dusen on November 11, 2006, for a physical. During this visit, he asked Dr. Van Dusen about the status of treatment for his hand Dr.Van Dusen told him that he was approved for three visits with the physical therapist. Again, affiant waited patiently for this to occur.

28. On November 27, 2006, affiant had x-rays taken of his right hip. This was a follow-up of the physical on November 11.

29. Toward the end of November, 2006, affiant was told by another inmate that CMS was not currently taking anyone out to physical therapy. Therefore, affiant waited knowing he would be seen again soon by medical personnel as a follow-up of his hip x-rays and blood work.

30. After two months, affiant was seen by Dr. Ott on February 13, 2007 (as a follow-up of his physical the previous fall). When affiant asked Dr. Ott about his hand, she reviewed his file and asked him why he had not filed a grievance. Affiant told her that he had been asking questioning and writing letters to no avail. Dr. Ott informed affiant that, "physical therapy isn't likely to be helpful at this point in time due to the delay in treatment." She wrote a consult for affiant to be re-evaluated by a surgeon. She also advised that affiant "may have been overlooked due to a cancellation or due to other reason." She advised him to keep up on a follow-up.

31. On February 22, 2007, affiant was taken to Bayhealth Physical Therapy where his hand was examined. The Physical Therapist advised affiant that a splint would help, along with ultrasound treatments. However, no treatment was done that day.

32. On March 12, 2007, affiant was seen by Dr. Van Dusen for another follow-up appointment of his physical. Dr. Van Dusen advised affiant that Bayhealth had recommended: 1) a thermoplastic splint, and, 2) ultrasound treatments. Affiant heard nothing more for the next nine weeks.

33. On May 10, 2007 affiant was again taken to Bayhealth Physical Therapy. A splint was constructed for affiant to wear at night. Affiant was advised that it could take up to six months to fully regain use of the right hand and fingers. Affiant was further advised that he had missed two appointments between February 22 and May 10, 2007.

34. Affiant was taken to Bayhealth Physical Therapy again on May 16 and May 25 for ultrasound treatments to his hand. He was told there would be a follow-up visit at a later date.

35. As of this date, August 6, 2007 affiant continues to exercise hand/fingers as directed and wear the hand splint at night. Rehabilitation of the fingers and hand continues to improve. However, there is still some numbness and stiffness that affects use of the hand.

Subscribed and sworn to before me this      6th      day of      August      2007.

Notary Public

My Commision Expires: Sept 18, 2008

## Hosterman Ron (DOC)

| | |
|---|---|
| **From:** | Jan McLaren [JMcLaren@cmsstl.com] |
| **Sent:** | Thursday, May 10, 2007 2:21 PM |
| **To:** | Hosterman Ron (DOC) |
| **Subject:** | Chronic Care Clinics defined |



Chronic Care Clinics
   Defined.d...
           Ron

Please include this article in the Isthmus per our discussion at OPS yesterday.

Jan

Exhibit #13

Chronic Care Clinics Defined

CMS and its medical staff wish to clarify what is and what is not covered under the Chronic Care Clinics offered at this site. CMS follows the nationally recognized NCCHC (National Commission on Correctional Health Care) standards for operating Chronic Care Clinics. The confusion of what is covered under Chronic Care Clinics and what is not seems to arise from the definition of what a Chronic disease is versus what a Chronic Care Clinic is. A chronic disease is defined as: an illness that effects an individual's well-being for at least a period of six months and is not curable, but can be managed to provide optimum functioning within any limitations the condition imposes on the individual. A Chronic Care Clinic is a treatment plan and regular clinic visits for specific, common diseases that are defined by the NCCHC. These diseases are:

1. Asthma
2. Diabetes
3. High blood Cholesterol-hyperlipidemia
4. HIV/HEP. C
5. High Blood Pressure- hypertension
6. Seizure Disorder
7. Tuberculosis

All other disease states, even though they may be life-long, recurring, and greater than six months in duration, are excluded from the Chronic Care Clinics performed at this site. This does not mean that treatment is not available for other conditions such as: pain, arthritis, psoriasis (dry skin), migraines headaches, fungal infections, or warts of any type. The medical staff will treat any and all chronic diseases however; if they are not listed on the above NCCHC defined Chronic Care Clinics list you will be charged for the visits like any other sick-call request.

Russell Steedley
SBI#00249572, W-1
Delaware Correctional Center
1181 Paddock Rd.
Smyrna, DE 19977

June 22, 2007

Carl Danberg, Commissioner
Bureau of Corrections
Administration Bldg.
245 McKee Rd.
Dover, DE 19904

RE: CMS's Inappropriate Cost Saving Policies

Dear Commissioner Danberg,

I am seeking your assistance concerning my chronic medical condition in which CMS, the contracted health care provider at D.C.C., refuses to provide adequate care. At my last medical appointment, June 18, 2007, I was told by the treating Nurse Practitioner, that CMS's administrators have refused to follow the recommendations offered by their own physicians and that of Dr. DuShuttle, an orthopedic specialist/surgeon. All of the medical experts that have reviewed my case have expressed serious concerns about my Osteoarthritic or Degenerative Joint Disease ("DJD") condition that's in my right hip joint. I was diagnosed with DJD, a chronic condition over ten years ago and have been treated with pain-relief medication ever since.

To date, all of my Grievances have been denied and are awaiting the second level of this process. However, during that last medical appointment I was also told that my latest blood tests revealed that I am already experiencing some negative side-affects from the years of using the prescribed pain-relievers and anti-inflammatory drugs that are directly impacting my kidneys. At that medical appointment, Nurse Practitioner Ihuma, who revealed this information to me, then placed me on another prescription drug specifically to combat those adverse effects that my current prescription has produced. However, this treatment would not be necessary if CMS's administrators gave their approval for the total joint replacement surgery recommended by the above listed physicians.

Dr. Van Dusin has expressed fears that my DJD condition may be necrosis, which means that the injured joint may be dying. If the joint is allowed to die, my leg would have to be amputated or I would die. Additionally, Nurse Practitioner Ihuma stated that if my kidneys are allowed to continue to deteriorate, I might have to be placed on a dialysis machine, which

Exhibit #14

will be inevitable concerning CMS's current treatment for me. In both cases, the cost saving policies of CMS's are directly contributing to my deteriorating condition and health, which is having a pernicious impact on my life. There has been no plausible medical explanation given as to why CMS's administrators continue to put off the corrective surgery, which would remedy my medical problems.

When you and I met a month ago at the Education Department of D.C.C. you ask that I first exhaust the Grievance process before submitting an appeal to your office. However, with this latest alarming medical information concerning my malfunctioning kidneys, concomitant with Dr. Van Dusin's fears that my DJD condition may develop into necrosis in the damaged joint, I felt the need to bring this to your attention now, because by the time Grievance process reaches fruition, irreparable damage may have set in and it will be too late to act.

Since this medical issue and others similarly related are not isolated and have much history behind it, I will forward to you a copy of some supporting documentations.

Any assistance that your office can provide in this matter will be greatly appreciated. Thanks in advance for your time, patience, and cooperation.

Very truly,

Russell Steedley, Inmate

cc:     Keesha West-Steedley
        Gilbert Steedley
        CMS
        File

## AFFIDAVIT OF EDWARD I. THOMPSON

1. I, Edward L. Thompson, am an inmate at the Delaware Correctional Center in Smyrna, Delaware, and that I have been incarcerated at this Institution since Aug 3, 1990

2. I am making this affidavit at the request of Russell E. Steedley, who is also an inmate at the Delaware correctional Center in Smyrna, Delaware.

3. This affidavit is being made without coercion and all parts of this statement is true and correct to the best of my abilities.

4. At the present time I am experiencing an on-going problem in getting proper medical care for several problems that have been both existent before and after my incarceration. All of which are listed below:

> A. I am a chronic care patient and have been for over ten years.
>
> B. I have had problems with my heart, but have never been told what the exact nature of the problem was.
>
> C. I am asthmatic, while also experiencing the first stages of emphysema.
>
> D. I have a degenerative disc (bone) disease in my lower spine (L3 –L4 / L4 – L5 / I5 –S1) to which I was finally given surgery to in 1995 after 4 years of complaining, and the medical departments failure or/ deliberate actions in securing my medical records from my lawyers at Schmittinger & Rodriquez, in Dover, Delaware. I am to date experiencing what they call "bone spurs" on my spine. When asked what they were going to do to treat it, their reply was, "Nothing!" This problem causes me extreme physical pain in my back, hip, and leg and interferes with my mobility.
>
> E. I have Hepatitis C with cirrhosis of the about 1/3 of my liver.

4. The above listed problems have been  on-going problem in getting treatment, and even in getting the proper medications at the proper time. The items and times listed below will corroborate these on going problems.

> 1. In April of 2005, I submitted a request to see a doctor concerning pains I had been having in my chest for over two months. This however was not my first request or complaint to this problem.

Exhibit #15                    1

2. In May of 2005, I was finally seen by a P.A. and an EKG was ordered along with x-rays for my chest and back

3. By August 23rd, I still had not had either done and the problem continued to persist. I wrote several sick-calls trying to address the problem and even wrote a letter of complaint to the Head of the Medical Dept.

4. On September 7, 2005, I wrote the Deputy warden's Office about the situation and received an answer that he was forwarding it to the Medical Dept on September 28th. By October 2005 I had still seen no doctor.

5. Around the 3rd, week of October my grievance was finally heard (#15536) To which I was assured that I would see a doctor soon.

6. On October 30th, I submitted a sick-call requesting that I be seen per grievance hearing and that I was now experiencing problems with my throat. A week later I received a reply back from medical stating that I was on the list to be seen.

7. On November 21, 2005, I still had not been seen, to which I then wrote a letter to Warden Carroll with a copy to Commissioner Stan Taylor. I never received any reply whatsoever. I also sent a copy of this letter to Chaplain Frank C. Pennell who knew of the problem and directed me to write the letter.

8. A few days after I sent the letter out I was seen by a doctor. Who informed me that when I had my last blood-work taken it showed that my liver enzymes had been spiked. Looking further into the medical records he found that they had been spiked for quite a while and suggested that I get a blood test done for Hepatitis C. My co-defendant also suggested that I get a test done as he had just found out that he had the disease.

9. I had the blood-work done in December of 2005, but was never given the outcome of the test until the day before my 53rd birthday (January 19, 2006).

10. I was seen several times sporadically by Dr. Niaz to which nothing was ever done.

11. I was given the vaccines for Hep A and B, but even then I had to stay on them about the last shot because they had forgotten

2

when it was supposed to be given. (per sick call requests that are in evidence.)

12. On Nov 2, 2006, I had a biopsy done which confirmed that I had Hepatitis C with cirrhosis of the liver at this time I was told that I was a geno-type 1b in the 3-4 stages of the disease.

13. December 2006, I had blood-work done again which concluded that my enzymes were in the 47 to 60 range and that my viral load was in the 17,000,000. (This was confirmed by Dr. MacDonald based upon blood-work that had been taken in October). Mr. MacDonald then reordered more blood-work done.

14. January 2nd, I seen Dr. MacDonald who stated that he could do nothing because he did not have the results of the blood-work. He did however, re-order blood-work.

15. By April of 2007, I still had not had the blood-work done nor seen anyone concerning my chronic care (the asthma, back, etc.)

16. Between November of 2006 to April of 2007, I had filed at least 4 grievances which have never been heard on appeal.

17. I was seen around the middle of April, by Ms. Ihoma (P.A.) who re-ordered my other medications along with putting me on tylenol which I cannot take because of my liver.

18. On April 28th, I filed my last grievance listing all the problems that I had been experiencing and since these problems were on going and reoccurring I listed them all. I received a reply to my grievance (May 22nd 2007) stating that I could not file it because it was a duplicate…and that I had one on appeal Which had already been at the level three stage appeal (commissioner) for over a month and a half before April 28th.

19. On May 5, 2007, I am seen by Dr. MacDonald who informed me again that he could do nothing because he did not have the results of the previous blood tests taken. He did however tell me that because of my geno-type and the stages in which my disease was in taking the Inerfuron would not really accomplish anything. And that at this point nothing could really be done other than be put on the list for a liver transplant.

20. On  May 22, 2007, I finally had my blood–work taken again.

21. June 7, 2007, Blood-work is again taken.

22. June 8, 2007, spoke directly to Mr. Carl C. Danberg concerning my medical problems and he stated that he'd see it was corrected.

23. June 28th, was seen by Dr. Van Dusen. Before I seen him however the intake nurse swore that I had seen a doctor on June 13, 2007, and even showed me the vitals that was taken. On June 28th, I weighed in a 236 lbs, but the vitals she showed me had me weighing 186 lbs. When I pointed this out to her, she took the records in to show someone and came out later with a new sheet…the old one was missing.

24. On June 30, 2007, I had an appointment to see Dr. MacDonald, but I also had a conflicting appointment at that same time…so as of July 20th, (today) I have not seen the infectious disease doctor since May.

The above statement is true and correct to the best of my knowledge and ability to remember.

Signed and Sworn and subscribed before me this ___24th___ day of __July__ 2007.

_Timothy J. Mart_
(Notary Public)

commission expires: June 14, 2008

Edward L. Thompson
# 00256882
D.C.C.  W-Building  K-16
1181 Paddock Road.
Smyrna, Delaware 19977

Affidavit of Uhuru Nasheed

I, Uhuru Nasheed hereby depose and state the following:

1. I'm an inmate incarcerated at the Delaware Correctional Center, Smyrna, De.

2. In April of 2001, or on approximate date within thirty (30) days thereof, I was diagnosed by a Dr. Ivens whom at the time was employed by CMS, as having "a degenerative foot ailment" that would eventually require surgery.

3. The same Dr. Ivens submitted a request for outside consultation with a podiatrist in reference to my foot ailment, and that I be fitted for an orthopedic "soft shoe" that would elevate the pain enough to allow me to walk in some comfort prior to surgery.

(Page 1 of 3)    Exhibit #16

4) At that time the medical staff only provided me with a pair of New Balance sneakers, issued to me by the prison laundry once every year. I never received the outside consultation or surgery.

5) In 2003 or 2004, I was seen by another Doctor here at DCC, whose Name I can not recall, for the increasing pain I was having in the same foot. He also submitted a recommendation for outside consultation, to No avail.

6) In 2006 or there about, I was seen by a Dr. Van Dusen for the same problem. He also submitted another request for outside consultation and made comment about the prior requests by Dr. Ivens in 2001.

7. I was seen in 2007 by a podiatrist here at D.C.C. and received two (2) shots of what I was told to be cortizone treatment in my right big toe, once every two months.

(page 2 of 3)

8. The podiatrist confered that the only way I would ever be able to walk pain free and with shoes, was to have surgery.

9. I have not seen or had any further treatment since. I'm still being given one pair of sneakers each year as treatment.

10. I make these statements without coercion and of my own free will, at the request of one Russell Steedly, in order to show a pattern of administering cost saving treatment practices, as opposed to necessary treatment by the medical staff assigned by CMS. My condition worsens each day and I still have not received any orthepedic shose, much less surgery.

Pursuant to 28 U.S.C. Section 1746, I declare and verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EXECUTED on 6/22/08 2008            Uhuru Nasheed
                    (pg. 3 of 3)

AFFIDAVIT IN SUPPORT OF CONTINUNACE
FOR RUSSELL STEEDLEY

1. I, Russell Steedley, am the affiant listed above and do depose and state the following facts in regard to Steedley v. CMS, et at., C.A.No.07-448.

2. Affiant is over eighteen years of age and is competent to make this declaration.

3. On July 19, 2007, the affiant filed a 1983 Complaint (D.I.#2), along with other motions, that included a request for attorney (D.I.#7).

4. On September 26, 2007, that affiant was officially informed by CMS staff that his operation has been approved, but the approving authority was never revealed to the affiant.

5. On October 1, 2007, affiant filed a "Stay of Proceeding" motion (D.I.#18), stating that if and when the operation was provided that the proceeding in this case be put on hold until the affiant had time to recover from surgery. Adding, that affiant would be housed in the prison's infirmary and he would not have access to his legal work or to the prison's law library during his stay in the infirmary.

6. In November 2007, an Amended Complaint, naming additional defendants was filed by the affiant, naming John Rundle and Scott Altman as defendants in the above caption case.

7. On January 21, 2008, affiant was taken to Milford Memorial Hospital and received the operation, Three days later, he was transferred directly to DCC's infirmary.

8. In February 2007, affiant filed another "Stay of Proceeding" (D.I. #39) and, "Request for Attorney" motion (D.I. #40).

9. Affiant's motion requesting an attorney was subsequently denied.

10. On May 28th, 2008, the affiant was released from DCC's infirmary and returned to his original housing unit. While housed in the infirmary, affiant was not allowed access to the prison's Law Library or his legal work.

Exhibit #17

11. On May 30th, 2008, the defendants' CMS, filed a motion for Summary Judgment.

12. Affiant submits that defendants filed summary judgment motion before meaningful discovery process could be initiated by the affiant.

13. Affiant requires full and unfettered discovery process to resolve the issue of who was the ultimate-decision makers, i.e. who approved of the January 2008, operation; Who is the Regional Medical Director (RMD) for CMS, since affiant's medical records indicate that they too had some control over the decision to deny or approve of operation; the exact duties and responsibilities of John Rundle and Scott Altman; Interrogatories on who made the decision to approval of operation prior to Dr.DuShuttle's October 2nd, 2007, appointment and recommendation; document requests that govern CMS's Chronic Care policies; and the whereabouts of Gail Eller, a former CMS employee, who accuses CMS's administrators of having the authority to approve of affiant's operation.

14. Pursuant to 28 U.S.C. Section 1746, I declare and verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____, 20008

Russell Steedley

TO:        Warden Thomas Carroll

FROM:      Russell Steedley, Inmate

DATE:      June 13, 2007

RE:        Denied of Adequate Medical Care & CMS's Illegitimate Chronic Care
           Policy

To Warden Carroll:

I am being denied adequate medical treatment by the current Health Care Provider (CMS), solely due to economic purposes. I have filed a Grievance regarding this situation or others that are closely related to this issue, but all have been denied by CMS. They based all of their decision on a non-medical terms or condition or in the case of chronic care clinics, they are blatantly contravening established Delaware law.

For over ten years I have been plagued by a debilitating physical condition called Osteoarthritis or Degenerative Joint Disease ("DJD"). However, all of the contracted health care providers, past and present, by this prison have refused to take the appropriate measures to remedy my situation. Rather they have opted to take the cost saving method of supplying me with various pain-reliever medications over corrective surgery, despite the recommendations by medical experts. Now CMS has invoked an illegitimate policy that would force myself and others who are similarly situated (all having a medically recognized chronic condition) to pay for all of our medical appointments and treatment that are classified as chronic care. They are now claiming that they only have seven chronic care clinics and therefore, despite the fact that an inmate/patient condition may be considered chronic, inmates would still have to pay for all appointments and treatment.

If I am forced to follow that policy, my annual medical bill would approach $72.00 a year, and it would have cost me around $720.00 since I was diagnosed with my DJD condition. This doesn't take into consideration my other chronic care conditions (Cluster Headaches) that aren't covered by CMS's new policy.

However, this is not the first time that CMS or any other health care provider has tried to pass this illegal policy. In accordance with, Delaware State Law 11 Del.C. § 6536 (b) and (c), which states: "…no inmate shall be charged for medical appointments, who have a chronic illness…" CMS new policy is illegal. The fact that they only have seven chronic care clinics is irrelevant. Since they are contractually obligated to provide medical care and treatment for all of the inmate population in Delaware, they must adhere to this law. The current Governor, when she was the Lt. Governor supported my position on this very same issue when CMS, FCM, and PHS (all contracted by this prison) tried to enforce this very same policy under the same argument – *we have limited chronic care clinics*. (See attached Supporting Documents). The Governor's office concluded that, "no inmate who has a diagnosed chronic condition should be forced to pay for follow-up appointments and treatment after an initial medical appointment."

In my case, I am being forced to pay for treatment that could be adverted if CMS administrators followed the medical advice of its' physician, Dr. Van Dusin; the medical expert who examined my hip, Dr. DuShuttle, an Orthopedic; and the Physical Therapist

Exhibit #18

from KGH. All were unanimous in their decision that I need a total hip replacement. All of my Grievances concerning these two issues appear to be in a state of perpetual limbo.

Therefore, I am asking your office to get involved in this matter. CMS's polices are in error and seemed to be set to made money at the expense of the indigent population here, despite the Delaware law that specifically covers chronic care treatment. Your cooperation in this matter will be greatly appreciated.

Very truly,

Russell Steedley, inmate
SBI#00249572, W-1
Delaware Correctional Center


cc:    Keesha West-Steedley
       Commissioner Danberg
       ACLU
       File

JTVCC James T. Vaughn Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261
Date: 07/07/2008

## GRIEVANCE REPORT

### OFFENDER GRIEVANCE INFORMATION

**Offender Name :** STEEDLEY, RUSSELL E

**Grievance #** : 151839

**Status** : Resolved

**Grievance Type:** Health Issue (Medical)

**IGC** : Merson, Lise M

SBI#              : 00249572

Grievance Date  : 02/17/2008

Resolution Status : Level 1

Incident Date      : 02/12/2008

Housing Location : Bldg W1, Tier D, Cell 7, Single

Institution    : JTVCC

Category       : Individual

Resol. Date    : 07/07/2008

Incident Time : 13:00

### OFFENDER GRIEVANCE DETAILS

**Description of Complaint:** Inmate claims:  in December, I was seen by a medical specialist for the lump growing on my neck. He recommended removing it, even if MRI results come back negative because the lump may still turn cancerous in the future and due to the precarious position or location of the lump ( it sits directly on the nerves that control my right side) On Feb. 12th., I was informed by Dr. O. ( the black female doctor assigned to patients housed in the infirmary) that CMS ( Corporate Headquarters) will never approve of an operation to remove that lump because they consider that type of operation an "elective" procedure.

**Remedy Requested** : For CMS to follow the recommendation of the medical expert consulted and approve of removing the lump or else I fear that my predicament will lead to what has happened to inmates Anthony Pierce and Donnie Weaver. CMS is well aware of those two cases and their culpability.

### INDIVIDUALS INVOLVED

| Type | SBI# | Name |
|------|------|------|
|      |      |      |

### ADDITIONAL GRIEVANCE INFORMATION

**Medical Grievance :** YES

**Investigation Sent** : 02/25/2008

**Grievance Amount :**

Date Received by Medical Unit : 02/25/2008

Investigation Sent To      : Moore, Ronnie

Exhibit #19

JTVCC James T. Vaughn Correctional Center
Date: 07/07/2008
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9201

## INFORMAL RESOLUTION

### OFFENDER GRIEVANCE INFORMATION

**Offender Name** : STEEDLEY, RUSSELL E

**Grievance #**   : 151839

**Status**        : Resolved

**Grievance Type:** Health issue (Medical)

**IGC**           : Merson, Lise M

**SBI#**                : 00249572

**Grievance Date** : 02/17/2008

**Resolution Status:** Level 1

**Incident Date**    : 02/12/2008

**Institution**   : JTVCC

**Category**      : Individual

**Inmate Status** :

**Incident Time** : 13:00

Housing Location :Bldg W1, Tier D, Cell 7, Single

INFORMAL RESOLUTION

**Investigator Name**  : Moore, Ronnie

**Date of Report** 02/25/2008

**Investigation Report** : 4/12/08-issue resolved; inmate signed off

**Reason for Referring:**

Offender's Signature:_____

Date           :_____

Witness (Officer)   :_____

November 13, 2001

Dear Warden Tom Carroll:

I am writing to you in order to seek any form of assistance that your office can render regarding the medical decisions and irrational practice of the current Health Care Providers "CMS."

I suffer from a chronic medical condition called Degenerative Joint Disease, which is extremely painful and disabling in many ways. For the past five years, the medical providers have treated me with a sundry of medicines in particular, "Indicin," which ameliorates my limited mobility and assuages the intense pain that I endure daily.

On November 6th, I went to a Doctor's appointment regarding my chronic my right knee and hip problem and was told by, Dr. Cancino that she will be switching of my medication for this condition by cutting me off from the current medication "Indicin" and replacing that with Tylenol tablets. Tylenol treatment has always been ineffective and does little to nothing for the incessantly pain that I endure daily.

In addition, Dr. Cancino performed a desultory examination of my knee, and defends her decision by stating that Indicin can have strong adverse side-effects upon ones liver. When ask what will it take for me to either taken to see a specialist or have corrective surgery upon my ailing knee and hip joints, Dr. Cancino stated that my knee would have to totally collapse. Her statement is consistent with all of the past CMS physicians, who seem only interested in saving their company money, either by cutting medication or denying inmates such as myself, access to corrective medical options – that would permanent fix the problem as oppose to simply treating the painful source with ineffective painkillers.

The previous health care provider, PHS, had recommend and referred me to a specialist, but this was never accomplished. Plus, their physician expressed acute concern for my condition following their X-rays results performed some two years ago.

Sir, I am in constant pain and this pain often becomes unendurable and feels as if I am being tortured. The medical staff does not seem concern with my suffering but rather with saving money for their company. I am seeking your assistant in this matter because I have reach my physical pain limits threshold and can no longer endure the pain.

Any assistant that your office can render in this matter will be greatly appreciated.

Very truly yours,

Russell Steedley
SBI#00249572, S-1

cc: Mr. Rosan, Esq.
  CMS Medical Staff
  Gibert Steedley

xc: File

Exhibit #20

**GRADY & HAMPTON, LLC**
6 NORTH BRADFORD STREET
DOVER, DELAWARE 19904

JOHN S. GRADY
STEPHEN A. HAMPTON

DOVER    (302) 678-1265
SUSSEX  (302) 855-1313
FAX      (302) 678-3544

January 28, 2008

VIA FAX: (202) 514-0212

Cathleen S. Trainor
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, NW
PHB Room 5908
Washington, DC  20530

            RE:    Delaware Prisons

Dear Cathy:

        I continue to get letters from prisoners on a semi-regular basis concerning the substandard medical health care in Delaware prisons.  My clients, who have been recently released from incarceration, confirm that no discernable progress has been made.

        I again call your attention to the case of Donnie Weaver.  I am sending you some of the materials he has sent to me.  It seems that Mr. Weaver had a lump on his neck that was ignored by the prison doctors for several years while it continued to grow larger and larger.  When he was finally sent to an outside doctor, it was learned that it was cancer.  His tumor could no longer be completely excised because of its size.  After the horrible case of Anthony Pierce, it is unfathomable that the medical staff in Delaware prisons would allow a similar case to reoccur, but it appears that they have.  I am disillusioned with the failure of the State to bring about any real improvement in the health care in the Delaware prisons.  Cases like Donnie Weaver's will continue to occur, unless someone forces the State to make improvements.

                                Sincerely yours,

                                Stephen A. Hampton

SAH/ph
Enclosures

cc: Donnie Weaver

Exhibit #21



**CMS**
DEDICATED PEOPLE
MAKING A DIFFERENCE
Correctional Medical Services

William Francis
SBI #264560  W1 D22
1181 Paddock Road
Smyrna, DE 19977

7 Dec 2006

Dear Mr. Francis,

I received your letter dated 5 Nov 2006 on 6 Dec 2006.

I reviewed your medical record in response to your concerns.  Although you have a well documented history of periodontal disease, you have not submitted a sick call slip requesting dental care in over 1 year (9/4/05).  The use of floss and picks in the institution is a security issue, not medical, and we cannot authorize devices for use that are prohibited by security.  If you continue to have problems, please submit a sick call slip requesting an evaluation from our dentist.

Please continue to let me know if you have any more questions

Your Partner in Healthcare,

Scott S. Altman
Quality Assurance Monitor
Correctional Medical Services

CC:  Warden Thomas Carroll
       Medical Record

Exhibit #22